ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
CONSUELO S. WOODHEAD (Cal. State Bar No. 69653)
EVAN J. DAVIS (Cal. State Bar No. 250484)
Assistant United States Attorneys
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-3987/4850
    Facsimile:  (213) 894-6269
    E-mail:    consuelo.woodhead@usdoj.gov
            evan.davis@usdoj.gov

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.

LOS ANGELES DOCTORS HOSPITAL, INC.,

        Defendant.

CR No. 12-00809

PLEA AGREEMENT

    1.    This constitutes the plea agreement between Los Angeles Doctors Hospital, Inc. ("defendant" or "LADH") and the United States Attorney's Office for the Central District of California ("the USAO") with respect to the conduct described in the Factual Basis of this agreement. This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

    2.    Defendant understands and agrees that this Agreement is part of a "package deal" in which the disposition of the case

against defendant is tied to and conditioned on the agreement of
Pacific Health Corporation and other related entities to be
jointly and severally liable for the payment of defendant's
restitution and to cooperate fully in the investigation and
prosecution of others, as set forth in the letter agreement for
deferred prosecution ("the Letter Agreement") attached hereto as
Exhibit A, which must be fully executed before this agreement
takes effect.  Defendant acknowledges that defendant has
discussed with defendant's attorney and carefully considered the
possible advantages and disadvantages to defendant of entering
into this Agreement as part of the package deal; and that
defendant is entering into this Agreement as part of the package
deal freely and voluntarily and not because of threats, coercion,
or other undue influence by the USAO or by any of the entities
who are part of the package deal, their counsel, or anyone acting
on their behalf.

<u>DEFENDANT'S OBLIGATIONS</u>

2.    Defendant agrees to:

a) Give up the right to indictment by a grand jury and,
at the earliest opportunity requested by the USAO and provided by
the Court, appear and plead guilty to a one-count information in
the form attached to this agreement as Exhibit B or a
substantially similar form.  Defendant enters into this
agreement, and will enter its guilty plea before the Court,
through an officer, agent, or attorney authorized to so act.

b) Not contest facts agreed to in this agreement.

c) Abide by all agreements regarding facts and
sentencing factors contained in this agreement.

d) Appear for all court appearances and obey any other ongoing court order in this matter.

e) Not commit any crime.

f) Be truthful at all times with Pretrial Services, the United States Probation Office, and the Court.

g) Pay the applicable special assessment at or before the time of sentencing.

h) Not seek the discharge of any restitution obligation, in whole or in part, in any present or future bankruptcy proceeding.

3. Defendant further agrees to cooperate fully with the USAO, the Department of Health and Human Services Office of Inspector General, the Federal Bureau of Investigation, the Internal Revenue Service, and, as directed by the USAO, any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authority. This cooperation requires defendant to:

a) Provide complete and truthful disclosure of all non-privileged information as may be requested by the USAO or its designee with respect to the activities of defendant and its subsidiaries and its and theirs present and former officers, employees, and agents;

b) Assemble, organize, and produce voluntarily all documents, records, or other tangible evidence relating to matters about which the USAO or its designee, inquires, including documents in the possession, custody or control of its subsidiaries;

1    c) Use its best efforts to facilitate the
2  availability of its present and former officers, employees, and
3  agents to provide information and/or testimony as requested by
4  the USAO or its designee, including attendance at all witness
5  interviews, grand jury sessions, trials, and other proceedings;
6  and
7    d) Provide testimony and other information deemed
8  necessary by the USAO or a court to identify or establish the
9  original location, authenticity, or other evidentiary foundation
10 necessary to admit into evidence documents in any proceeding as
11 requested by the Offices.
12    Nothing in this agreement shall require defendant to waive
13 any protections of the attorney-client privilege, attorney work-
14 product doctrine, or any other applicable privilege.  Nor shall
15 anything in this agreement preclude the government from seeking
16 an order authorizing or requiring the disclosure of
17 communications over which defendant may claim a privilege,
18 including in the event that an individual defendant asserts that
19 he or she relied in good faith on advice of counsel provided to
20 defendant or one of its subsidiaries.
21    4.   For purposes of this agreement: (1) "Cooperation
22 Information" shall mean any statements made, or documents,
23 records, tangible evidence, or other information provided, by
24 defendant pursuant to defendant's cooperation under this
25 agreement; and (2) "Plea Information" shall mean any statements
26 made by defendant, under oath, at the guilty plea hearing and the
27 agreed to factual basis statement in this agreement.
28

THE USAO'S OBLIGATIONS

5.    The USAO agrees to:

a) Not contest facts agreed to in this agreement.

b) Abide by all agreements regarding sentencing factors contained in this agreement.

c) At the time of sentencing, provided that defendant has fully cooperated in the investigation and clearly demonstrated an acceptance of responsibility for the offense up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guideline culpability score, pursuant to U.S.S.G. § 8C2.5(g)(2).

d) Recommend to the Court that defendant's obligation to make restitution shall be subject to the same payment schedule set forth in any settlement of civil claims under the civil False Claims Act for the conduct described in the Factual Basis.

6.    The USAO further agrees:

a) Not to offer as evidence in its case-in-chief in the above-captioned case or any other criminal prosecution that may be brought against defendant by the USAO, or in connection with any sentencing proceeding in any criminal case that may be brought against defendant by the USAO, any Cooperation Information. Defendant agrees, however, that the USAO may use both Cooperation Information and Plea Information: (1) to obtain and pursue leads to other evidence, which evidence may be used for any purpose, including any criminal prosecution of defendant; (2) to cross-examine defendant should defendant testify, or to rebut any evidence offered, or argument or representation made, by defendant, defendant's counsel, or a witness called by

1  defendant in any trial, sentencing hearing, or other court

2  proceeding; and (3) in any criminal prosecution of defendant for

3  false statement, obstruction of justice, or perjury.

4         b) Not to use Cooperation Information against

5  defendant at sentencing for the purpose of determining the

6  applicable guideline range, including the appropriateness of an

7  upward departure, or the sentence to be imposed, and to recommend

8  to the Court that Cooperation Information not be used in

9  determining the applicable guideline range or the sentence to be

10 imposed. Defendant understands, however, that Cooperation

11 Information will be disclosed to the probation office and the

12 Court, and that the Court may use Cooperation Information for the

13 purposes set forth in U.S.S.G. § 1B1.8(b) and for determining the

14 sentence to be imposed.

15                    NATURE OF THE OFFENSE

16       7.   Defendant understands that for defendant to be guilty

17 of the crime charged in the Information, which is a violation of

18 Title 18, United States Code, Section 371, Conspiracy to Pay

19 Illegal Remunerations for Patient Referrals, the following must

20 be true: (1) beginning in or about July 2003, and ending in or

21 about May 2008, there was an agreement between two or more

22 persons to pay and receive illegal remunerations for patient

23 referrals, in violation of Title 42, United States Code, Section

24 1320a-7b(b)(2)(A); (2) defendant became a member of the

25 conspiracy knowing its object and intending to accomplish it; and

26 (3) a member of the conspiracy performed an overt act for the

27 purpose of carrying out the conspiracy.  Proving a violation of

28 Title 42, United States Code, Section 1320a-7b(b)(2)(A), requires

1  proving the following three elements: (1) the defendant offered
2  or paid remuneration in cash or kind to a person; (2) the
3  defendant offered or paid the remuneration in return for the
4  referrals of an individual for the furnishing of a service for
5  which payment may be made under a Federal health care program;
6  (3) the defendant acted knowingly and willfully, that is, with
7  knowledge of the law and the specific intent to violate it.
8  Defendant admits that defendant is, in fact, guilty of this
9  offense as described in the one-count information.

10                   PENALTIES AND RESTITUTION

11      8.   Defendant understands that the statutory maximum the
12  Court can impose on an organization for the offense to which
13  defendant is pleading guilty is: (a) a fine of $500,000 or twice
14  the gross gain or twice the gross loss resulting from the
15  offense, whichever is greatest; (b) a term of probation of five
16  years; and (c) a mandatory special assessment of $400.

17      9.   Defendant understands that defendant will be required
18  to pay full restitution to the victims of the offense. The
19  parties stipulate that the applicable amount of restitution is
20  $15,947,785 for Medicare and Medi-Cal combined. The parties also
21  agree that payments made to the government in satisfaction of any
22  civil resolution of claims under the False Claims Act, 31 U.S.C.
23  § 3729, based upon the conduct set forth in the Factual Basis of
24  this agreement, shall be deemed payments toward restitution.

25      10.  Defendant understands that the conviction in this case
26  may also subject defendant to various other collateral
27  consequences, including but not limited to mandatory exclusion
28  from federal health care programs for a minimum of five years,

1 suspension or revocation of any license or status granted by

2 government agencies, and revocation of probation in another case.

3 Defendant understands that unanticipated collateral consequences

4 to itself or any related or successor entity will not serve as

5 grounds to withdraw defendant's guilty plea.

6                          FACTUAL BASIS

7        11.  Defendant and the USAO agree to the statement of facts

8 provided below. Defendant and the USAO agree that this statement

9 of facts is sufficient to support a plea of guilty to the charge

10 described in this agreement and to establish the Sentencing

11 Guidelines factors set forth in paragraph 13 below but is not

12 meant to be a complete recitation of all facts relevant to the

13 underlying criminal conduct or all facts known to either party

14 that relate to that conduct.

15    Background

16       Defendant is a California corporation with its
17    principal place of business in Los Angeles, California and
      is a subsidiary of Pacific Health Corporation ("PHC"), a
18    Georgia Corporation.  J.W.Y. was the Chief Executive Officer
      and Chairman of the Board of LADH and PHC.
19
20       From no later than July 2003 through no earlier than
      May 2008, PHC was in the business of operating hospitals,
21    including Los Angeles Doctors Corporation, doing business as
      Los Angeles Metropolitan Medical Center ("LAMMC"), Tustin
22    Hospital and  Medical Center, a California corporation,
      doing business as Newport Specialty Hospital (formerly doing
23    business as Tustin Hospital and Medical Center)
      (collectively "THMC"), and Aesculap Hospital Corporation,
24    AMISUB Inc., Anaheim General Hospital Corporation and
      Anaheim General Hospital, Ltd, a California limited
25    partnership, doing business as Anaheim General Hospital
      ("Anaheim")(collectively "the Hospitals"), which it operated
26    through subsidiaries. During this time, defendant provided
      payroll services to LAMMC.
27
28       During this time, defendant, PHC, and J.W.Y. knew that

it was illegal to pay kickbacks for the referral of patients
for health services or that may be paid for by Medicare or
Medi-Cal, which are federal health care benefit programs,
affecting commerce, for the elderly and indigent,
respectively, and that Medicare and Medi-Cal would not pay
for services procured by kickbacks. Defendant, PHC, and
J.W.Y. also knew that Medicare and Medic-Cal only covered
medically necessary services and would not pay for services
that were medically unnecessary.

The Kickbacks Conspiracy

    Beginning in or about July 2003, and continuing to in
or about May 2008, defendant agreed with PHC, LAMMC, and
others known and unknown to participate in a conspiracy to
increase in-patient stays to the Hospitals by admitting
Medicare and Medi-Cal beneficiaries recruited by Estill
Mitts ("Mitts") and F.M. ("F.M."). In furtherance of the
conspiracy, the Hospitals paid Mitts and F.M. illegal
remunerations to recruit Medicare and Medi-Cal
beneficiaries.  At J.W.Y.'s direction, and while J.W.Y. and
defendant LADH knew that PHC and the Hospitals had obtained
patients through the payment of illegal kickbacks to Mitts
and F.M., and that LAMMC and the Hospitals were providing
medical care to the recruited patients that could not be
submitted as a valid basis to bill Medicare or Medi-Cal,
defendant LADH administered the payroll of LAMMC staff who
provided billing services for and in-patient services to the
recruited patients admitted to LAMMC, including those for
whom in-patient hospitalization was not medically necessary.
As defendant knew and intended, LAMMC and the other
Hospitals billed Medicare and Medi-Cal for in-patient
services to the illegally recruited beneficiaries, including
those for whom in-patient hospitalization was not medically
necessary.

The Assessment Center and F.M.'s Company

In furtherance of the conspiracy, Mitts owned and operated a
facility called the Assessment Center ("the Assessment
Center"), located in the City of Los Angeles in the area
commonly known as Skid Row. As defendant knew, the
Assessment Center was a site that Mitts used for the purpose
of recruiting homeless Medicare and Medi-Cal beneficiaries
for referral to local hospitals, including LAMMC and the
other Hospitals.  Also in furtherance of the conspiracy,
F.M. owned and operated a company that recruited patients
from board and care facilities located in Los Angeles and

San Bernardino Counties.  As defendant well knew, LAMMC and the other Hospitals paid Mitts and F.M. monthly kickbacks for the referral of recruited Medicare and Medi-Cal beneficiaries to the Hospitals, including to LAMMC. Defendant administered the payroll of LAMMC staff who provided in-patient services to illegally recruited beneficiaries, including those for whom in-patient hospitalization was not medically necessary.

In-Patient Hospitalizations

    In furtherance of the conspiracy, the Assessment Center and F.M.'s company would contact the Hospitals regarding the admission of recruited Medicare and Medi-Cal beneficiaries for in-patient stays at the Hospitals, including at LAMMC. As defendant well knew, neither the Assessment Center nor F.M.'s company were medical clinics, and their staffs were not medical professionals.  As defendant well knew, no medical professionals were seeing the recruited beneficiaries prior to them being referred and transported to the Hospitals, including to LAMMC.

Overt Acts

    On or about October 3, 2006, PHC approved the issuance of a check from THMC in the amount of $23,375 payable to Metropolitan Healthcare, a company owned by Mitts, as payment for Mitts' referral of recruited Medicare and Medi-Cal beneficiaries admitted to THMC in September 2006.

    On or about October 17, 2006, PHC approved the issuance of a check from LAMMC in the amount of $5,000 payable to Metropolitan Healthcare, as payment for Mitts' referral of recruited Medicare and Medi-Cal beneficiaries admitted to LAMMC in September 2006.

    On or about October 20, 2006, PHC approved the issuance of a check from THMC in the amount of $29,500 payable to a company owned by F.M. as payment for F.M.'s referral of recruited Medicare and Medi-Cal beneficiaries admitted to the THMC in September 2006.

Total Kickback Payments and Impact on Medicare and Medi-Cal

    The total amount of illegal remunerations for patient referrals that PHC, acting on behalf of the Hospitals, including LAMMC, paid and caused to be paid during the course of the conspiracy was approximately $923,616 to Mitts

and $1,460,500 to F.M., for a combined total of approximately $2,384,116.

Medicare and Medi-Cal paid the Hospitals approximately $15,947,785 for claims submitted for services provided to beneficiaries admitted as a result of illegal remunerations paid or caused to be paid by defendant to Mitts and F.M. during the course of the conspiracy.

## SENTENCING FACTORS

12. Defendant understands that in determining defendant's sentence the Court is required to consider the factors set forth in 18 U.S.C. § 3553(a)(1)-(7), including the kinds of sentence and sentencing range established under the Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crime of conviction.

13. Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

a) Restitution order in the amount of $15,947,785, pursuant to U.S.S.G. § 8B1.1(a)(1).

b) Five years probation with a condition requiring full payment of restitution and the adoption of an effective compliance and ethics program pursuant to U.S.S.G §§ 8B1.1(a)(2), 8D1.1(a), 8D1.3(b) and 8D1.4.

14. The parties agree that the fine computed under the Sentencing Guidelines would be higher than the statutory maximum

1  of $500,000.   Therefore, a further determination of guideline

2  fine range is unnecessary. The government reserves the right to

3  argue for a fine up to the statutory maximum and defendant

4  reserves the right to argue that it does not have the ability to

5  pay any fine in addition to restitution.

6                  WAIVER OF CONSTITUTIONAL RIGHTS

7       15.   Defendant understands that by pleading guilty,

8  defendant gives up the following rights:

9            a) The right to persist in a plea of not guilty.

10           b) The right to a speedy and public trial by jury.

11           c) The right to be presumed innocent and to have the

12  burden of proof placed on the government to prove defendant

13  guilty beyond a reasonable doubt.

14           d) The right to confront and cross-examine witnesses

15  against defendant.

16           e) The right to present evidence in opposition to the

17  charge, including calling witnesses and subpoenaing those

18  witnesses to testify.

19           f) The right, if defendant chose not to present

20  evidence, to have that choice not be used against defendant.

21           g) Any and all rights to pursue any affirmative

22  defenses, Fourth Amendment or Fifth Amendment claims, and other

23  pretrial motions that have been filed or could be filed.

24                  WAIVER OF APPEAL OF CONVICTION

25       16.   Defendant understands that, with the exception of an

26  appeal based on a claim that defendant's guilty plea was

27  involuntary, by pleading guilty defendant is waiving and giving

28  up any right to appeal defendant's conviction on the offense to

                              12

1 | which defendant is pleading guilty.

2 | LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

3 |     17.  Defendant gives up the right to appeal all of the

4 | following: (a) the procedures and calculations used to determine

5 | and impose any portion of the sentence; (b) the fine imposed by

6 | the court, provided it is within the statutory maximum; (c) the

7 | amount and terms of any restitution order, provided it requires

8 | payment of no more than $15,947,785; and (d) the term of

9 | probation imposed by the Court, provided it is within the

10 | statutory maximum.

11 |     18.  The USAO agrees that, provided that all portions of the

12 | sentence are at or below the statutory maximum specified above,

13 | the USAO gives up its right to appeal any portion of the

14 | sentence, with the exception that the USAO reserves the right to

15 | appeal the amount of restitution ordered if that amount is less

16 | than $15,947,785.

17 | RESULT OF WITHDRAWAL OF GUILTY PLEA

18 |     19.  Defendant agrees that if, after entering a guilty plea

19 | pursuant to this agreement, defendant seeks to withdraw and

20 | succeeds in withdrawing defendant's guilty plea on any basis

21 | other than a claim and finding that entry into this plea

22 | agreement was involuntary, then (a) the USAO will be relieved of

23 | all of its obligations under this agreement, including in

24 | particular its obligations regarding the use of Cooperation

25 | Information; and (b) in any investigation, criminal prosecution,

26 | or civil, administrative, or regulatory action, defendant agrees

27 | that any Cooperation Information and any evidence derived from

28 | any Cooperation Information shall be admissible against

1  defendant, and defendant will not assert, and hereby waives and

2  gives up, any claim under the United States Constitution, any

3  statute, or any federal rule, that any Cooperation Information or

4  any evidence derived from any Cooperation Information should be

5  suppressed or is inadmissible.

6  EFFECTIVE DATE OF AGREEMENT

7      20.  Subject to paragraph 2 above, this agreement is

8  effective upon signature and execution of all required

9  certifications by defendant, defendant's counsel, and an

10  Assistant United States Attorney.

11  BREACH OF AGREEMENT

12      21.  Defendant agrees that if defendant, at any time after

13  the signature of this agreement and execution of all required

14  certifications by defendant, defendant's counsel, and an

15  Assistant United States Attorney, knowingly violates or fails to

16  perform any of defendant's obligations under this agreement ("a

17  breach"), the USAO may declare this agreement breached.  All of

18  defendant's obligations are material, a single breach of this

19  agreement is sufficient for the USAO to declare a breach, and

20  defendant shall not be deemed to have cured a breach without the

21  express agreement of the USAO in writing. If the USAO declares

22  this agreement breached, and the Court finds such a breach to

23  have occurred, then:

24      a) If defendant has previously entered a guilty plea

25  pursuant to this agreement, defendant will not be able to

26  withdraw the guilty plea.

27      b) The USAO will be relieved of all its obligations

28  under this agreement; in particular, the USAO: (i) will no longer

14

1  be bound by any agreements concerning sentencing and will be free
2  to seek any sentence up to the statutory maximum for the crime to
3  which defendant has pleaded guilty; and (ii) will no longer be
4  bound by any agreement regarding the use of Cooperation
5  Information and will be free to use any Cooperation Information
6  in any way in any investigation, criminal prosecution, or civil,
7  administrative, or regulatory action.

8      c) The USAO will be free to criminally prosecute
9  defendant for false statement, obstruction of justice, and
10  perjury based on any knowingly false or misleading statement by
11  defendant.

12      d) In any investigation, criminal prosecution, or
13  civil, administrative, or regulatory action, defendant agrees
14  that any Cooperation Information and any Plea Information, as
15  well as any evidence derived from any Cooperation Information or
16  any Plea Information, shall be admissible against defendant, and
17  defendant will not assert, and hereby waives and gives up, any
18  claim under the United States Constitution, any statute, Rule 410
19  of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules
20  of Criminal Procedure, or any other federal rule, that any
21  Cooperation Information, any Plea Information, or any evidence
22  derived from any Cooperation Information or any Plea Information
23  should be suppressed or is inadmissible.

24      22.  In addition, following the Court's finding of a knowing
25  and willful breach of this agreement by defendant, should the
26  USAO elect to pursue any charge that was not filed as a result of
27  this agreement, then:

28      (a) defendant agrees that any applicable statute of

15

1 limitations is tolled between the date of defendant's signing of

2 this agreement and the commencement of any such prosecution or

3 action; and

4       (b) defendant gives up all defenses based on the

5 statute of limitations, any claim of pre-indictment delay, or any

6 speedy trial claim with respect to any such prosecution, except

7 to the extent that such defenses existed as of the date of

8 defendant's signing this agreement.

9       COURT AND PROBATION OFFICE NOT PARTIES

10    23. Defendant understands that the Court and the United

11 States Probation Office are not parties to this agreement and

12 need not accept any of the USAO's sentencing recommendations or

13 the parties' agreements to facts or sentencing factors.

14    24. Defendant understands that both defendant and the USAO

15 are free to: (a) supplement the facts by supplying relevant

16 information to the United States Probation Office and the Court,

17 (b) correct any and all factual misstatements relating to the

18 Court's Sentencing Guidelines calculations, and (c) argue on

19 appeal and collateral review that the Court's Sentencing

20 Guidelines calculations are not error, although each party agrees

21 to maintain its view that the calculations in paragraph 13

22 are consistent with the facts of this case. While this paragraph

23 permits both the USAO and defendant to submit full and complete

24 factual information to the United States Probation Office and the

25 Court, even if that factual information may be viewed as

26 inconsistent with the facts agreed to in this agreement, this

27 paragraph does not affect defendant's and the USAO's obligations

28 not to contest the facts agreed to in this agreement.

25. Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to fulfill all defendant's obligations under this agreement. Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

## NO ADDITIONAL AGREEMENTS

26. Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

//
//
//
//
//
//
//
//
//

<u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

27.   The parties agree that this agreement will be
considered part of the record of defendant's guilty plea hearing
as if the entire agreement had been read into the record of the
proceeding.


AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF CALIFORNIA

ANDRÉ BIROTTE JR.
United States Attorney

_____         8/20/12
CONSUELO S. WOODHEAD                       _____
Assistant United States Attorney           Date

_____         4/27/12
MICHAEL CHOO                               _____
President and CEO                           Date
Authorized Agent for
Defendant LOS ANGELES DOCTORS
HOSPITAL, INC.


_____         _____
DUANE LYONS                                 Date
Quinn Emanuel Urquhart & Sullivan, LLP
Attorney for Defendant
LOS ANGELES DOCTORS HOSPITAL, INC.

1    PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

2        27.   The parties agree that this agreement will be

3   considered part of the record of defendant's guilty plea hearing

4   as if the entire agreement had been read into the record of the

5   proceeding.

6

7   AGREED AND ACCEPTED

8   UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF CALIFORNIA
9
    ANDRÉ BIROTTE JR.
10  United States Attorney

11

12  _____           Date
    CONSUELO S. WOODHEAD
13  Assistant United States Attorney

14

15  _____           Date
    MICHAEL CHOO
16  President and CEO
    Authorized Agent for
17  Defendant LOS ANGELES DOCTORS
    HOSPITAL, INC.

18

19  _____           4/27/12
    DUANE LYONS                            Date
20  Quinn Emanuel Urquhart & Sullivan, LLP
    Attorney for Defendant
21  LOS ANGELES DOCTORS HOSPITAL, INC.

22

23

24

25

26

27

28

19

CERTIFICATION OF DEFENDANT

I, the undersigned, am an officer as stated below and have authority to sign and bind Los Angeles Doctors Hospital, Inc. ("LADH"). On behalf of Los Angeles Doctors Hospital, Inc., I state the following. I have read this agreement in its entirety. The governing board of LADH and I have had enough time to review and consider this agreement, and have carefully and thoroughly discussed every part of it with counsel for LADH, Duane Lyons and Mark Hardiman. I understand the terms of this agreement, and LADH voluntarily agrees to those terms. I have discussed the evidence with my attorney, and counsel for LADH who has advised LADH of its rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me or LADH other than those contained in this agreement. No one has threatened or forced LADH in any way to enter into this agreement. LADH and I are satisfied with the representation of LADH's attorneys in this matter, and LADH is pleading guilty because LADH is guilty of the charge and wishes to take advantage

1  of the promises set forth in this agreement, and not for any

2  other reason.

3  _____          4/27/12
                                            _____
4  MICHAEL CHOO                             Date
   President and CEO
5  Authorized Agent for
   Defendant LOS ANGELES DOCTORS
6  HOSPITAL, INC.

7

8              CERTIFICATION OF DEFENDANT'S ATTORNEY

9       I am Los Angeles Doctors Hospital, Inc.'s attorney.  I have

10 carefully and thoroughly discussed every part of this agreement

11 with my client.  Further, I have fully advised my client of its

12 rights, of possible pretrial motions that might be filed, of

13 possible defenses that might be asserted either prior to or at

14 trial, of the sentencing factors set forth in 18 U.S.C.

15 § 3553(a), of relevant Sentencing Guidelines provisions, and of

16 the consequences of entering into this agreement.  To my

17 knowledge: no promises, inducements, or representations of any

18 kind have been made to my client other than those contained in

19 this agreement; no one has threatened or forced my client in any

20 way to enter into this agreement; my client's decision to enter

21 into this agreement is an informed and voluntary one; and the

22 factual basis set forth in this agreement is sufficient to

23

24

25

26

27

28

21

1 | support my client's entry of a guilty plea pursuant to this

2 | agreement.

3 |

4 |

5 | DUANE LYONS                                    Date
Quinn Emanuel Urquhart & Sullivan, LLP

6 | Attorney for Defendant
LOS ANGELES DOCTORS HOSPITAL, INC.

4/27/12



U. S. Department of Justice

*United States Attorney*
*Central District of California*

---

*Evan J. Davis*
*Assistant United States Attorney*
*Criminal Division/Major Frauds Section*
*(213) 894-4850; fax 894-6269*
*Evan.Davis@usdoj.gov*

*1100 US Courthouse*
*312 North Spring Street*
*Los Angeles, California 90012*

April 27, 2012

Via electronic mail to duanelyons@quinnemanuel.com
Duane Lyons, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
Attorneys for Pacific Health Corporation

**Re:    Deferred Prosecution Agreement for Pacific Health Corporation**

Dear Mr. Lyons:

1.     On the understandings and agreements specified below, the United States Attorney's Office for the Central District of California ("USAO") will defer the criminal prosecution of your client, Pacific Health Corporation ("PHC"), and its associated entities and subsidiaries, Los Angeles Doctors Corporation, doing business as Los Angeles Metropolitan Medical Center ("LAMMC"), Tustin Hospital and Medical Center, a California corporation, doing business as Newport Specialty Hospital (formerly doing business as Tustin Hospital and Medical Center) (collectively "THMC"), and Aesculap Hospital Corporation, AMISUB Inc., Anaheim General Hospital Corporation and Anaheim General Hospital, Ltd, a California limited partnership, doing business as Anaheim General Hospital ("Anaheim"), and all of their subsidiaries (collectively "PHC Entities"), for all federal crimes (except for criminal tax violations, as to which the USAO cannot and does not make any agreement) arising from conduct described in the Factual Basis contained in the Plea Agreement ("Factual Basis") for the Los Angeles Doctors Hospital, Inc., ("LADH"), as described in greater detail below.

2.     The USAO enters into this Deferred Prosecution Agreement based, in part, on the following factors: (a) the guilty plea of co-conspirator and PHC subsidiary, LADH; (b) the replacement of management employees of PHC Entities who participated in the conduct described in the Factual Basis; (c) the PHC Entities' acceptance of responsibility for their criminal conduct; (d) the PHC Entities' willingness to compensate their victims; (e) the PHC Entities' willingness to cooperate in the investigation and prosecution of others, including former management employees; and (f) the PHC Entities' willingness to implement a corporate compliance program on the terms set forth in paragraph 8 below.

3.     The PHC Entities admit the facts as set forth in the Factual Basis contained in the Plea

1



Agreement for LADH attached as **Exhibit 1**, accept and acknowledge responsibility for their conduct as set forth in Exhibit 1, and agree not to make any public statement contradicting the facts contained therein.

4.      An Information against PHC based on the Factual Basis is attached hereto as **Exhibit 2.** By signing this agreement, PHC agrees to waive the right to indictment by grand jury and agrees that the USAO may file the Information and this Deferred Prosecution Agreement. Pursuant to this Agreement, the parties agree to jointly recommend that the prosecution of PHC on the Information be deferred for a period of six years from the filing date of the Information. If the Court declines to defer prosecution for any reason, this Agreement shall be null and void, and the parties will revert to their pre-Agreement position, subject to the tolling provisions herein.

5.      The USAO agrees that, if the PHC Entities are in compliance with all of their obligations under this Agreement, the USAO will, at the expiration of the period of deferral seek dismissal with prejudice of the Information filed against PHC. The USAO further agrees that except in the event of a violation by the PHC Entities of any term of this Agreement, the USAO will bring no additional charges against PHC for any federal crimes (except for criminal tax violations, as to which the USAO cannot and does not make any agreement) arising from conduct described in the Factual Basis contained in the Plea Agreement ("Factual Basis") for the Los Angeles Doctors Hospital, Inc. ("LADH").

6.      This Agreement does not provide any protection against prosecution for any crimes except as set forth above, and applies only to the PHC Entities and not to any other entities or individuals except as set forth in this Agreement.

7.      For six years following execution of this Agreement, the PHC Entities shall commit no state or federal crimes.

8.      Further, for the same term, the PHC Entities shall implement a corporate compliance program on the terms set forth in the attached draft Corporate Integrity Agreement, **Exhibit 3**. However, if any PHC Entity executes a Corporate Integrity Agreement with the United States Department of Health and Human Services during the term of this agreement, that agreement shall serve as the corporate compliance program required by this agreement in lieu of Exhibit 3.

9.      As a condition of this Agreement, the PHC Entities agree that they are and shall be jointly and severally liable with LADH to make restitution in this matter as stated in LADH's plea agreement, totaling $15,947,785 for Medicare and Medi-Cal combined, which reflects the amount of Medicare and Medi-Cal payments made to the PHC Entities as a result of the patients referred to the PHC entities through the illegal consulting services agreements identified in the attached Factual Basis. The parties also agree that payments made to the government in satisfaction of any civil resolution of claims under the False Claims Act, 31 U.S.C. § 3729, based upon the conduct set forth in the Factual Basis, shall be deemed payments toward restitution. The USAO will recommend to the Court that LADH's obligation to make restitution shall be subject to the same payment schedule set forth in any settlement of claims brought under the False Claims Act. The parties further agree that if the Court does not follow the government's

recommendation that, the PHC Entities (other than LADH) shall nevertheless only be obligated to make restitutionary payments pursuant to the schedule set forth in any settlement of claims brought under the False Claims Act and that no breach of this deferred prosecution agreement shall occur as a result of the PHC Entities' failure to pay restitution provided that the PHC Entities have made restitutionary payments pursuant to the terms set forth in any settlement of claims under the Civil False Claims Act.

10.    Attached hereto as **Exhibits 4 and 5** are a stipulation for entry of judgment and a judgment against the PHC Entities, executed by the PHC Entities and the USAO.  Pursuant to this agreement, the PHC Entities agree that the USAO may file this stipulation and judgment if LADH fails to comply with any of its restitution obligations imposed as a result of its guilty plea. This includes LADH failing to timely pay any restitution as ordered by the Court or the Probation Office pursuant to authority as stated in the Judgment and Commitment Order against LADH, provided however that pursuant to paragraph 9 of this agreement, the USAO will not file the stipulation for entry of judgment if the PHC entities have made restitutionary payments pursuant to the schedule set forth in a Civil False Claims Act settlement.   If the USAO, in its sole discretion and based on good faith, files the stipulation and lodges the judgment, then the PHC Entities shall owe immediately the full amount of outstanding restitution and the United States.

11.    The PHC Entities agree to comply fully with the attorney-client privilege order entered by the Honorable George H. King in Case No. CR Misc. 12-84-GHK on March 7, 2012, and to forthwith take all reasonable steps to make all former counsel available for interviewing concerning the matters covered by the order.

12..    Regarding cooperation, the parties agree as follows:

    a.    The PHC Entities agree to cooperate fully with the USAO, the Department of Health and Human Services Office of Inspector General, the Federal Bureau of Investigation, the Internal Revenue Service, and, as directed by the USAO, any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authority. This cooperation requires the PHC Entities to:

        i) Provide complete and truthful disclosure of all non-privileged information as may be requested by the USAO or its designee with respect to the activities of the PHC Entities, their subsidiaries, and their present and former officers, employees, and agents;

        ii) Assemble, organize, and produce voluntarily all documents, records, or other tangible evidence relating to matters about which the USAO or its designee inquires, including documents in the possession, custody, or control of their subsidiaries;

        iii) Use their best efforts to facilitate the availability of their present and former officers, employees, and agents to provide information and/or testimony as requested by the USAO or its designee, including attendance at all witness interviews, grand jury sessions,

trials, and other proceedings; and

    iv) Provide testimony and other information deemed necessary by the USAO or a court to identify or establish the original location, authenticity, or other evidentiary foundation necessary to admit into evidence documents in any proceeding as requested by the USAO.

    b.    Nothing in this agreement shall require the PHC Entities to waive any protections of the attorney-client privilege, attorney work-product doctrine, or any other applicable privilege. Nor shall anything in this agreement preclude the government from seeking an order authorizing the disclosure of communications over which the PHC Entities may claim a privilege, including in the event that an individual defendant asserts that he or she relied in good faith on advice of counsel provided to the PHC Entities or one of their subsidiaries.

    c.    For purposes of this agreement: (1) "Cooperation Information" shall mean any statements made, or documents, records, tangible evidence, or other information provided, by the PHC Entities pursuant to their cooperation under this agreement; and (2) "Plea Information" shall mean any statements made by the PHC Entities, under oath, at any guilty plea hearing and the agreed to factual basis statement attached to this agreement.

    d.    The USAO agrees to:

    i) Not contest facts agreed to in this agreement.

    ii) Not to offer as evidence in its case-in-chief in any criminal prosecution that may be brought against any of the PHC Entities by the USAO, or in connection with any sentencing proceeding in any criminal case that may be brought against any PHC Entity by the USAO, any Cooperation Information. The PHC Entities agree, however, that the USAO may use both Cooperation Information and Plea Information: (1) to obtain and pursue leads to other evidence, which evidence may be used for any purpose, including any criminal prosecution of any person or entity; (2) to cross-examine a PHC Entity witness, or to rebut any evidence offered, or argument or representation made, by a PHC Entity, a PHC Entity's counsel, or a witness called by a PHC entity in any trial, sentencing hearing, or other court proceeding; and (3) in any criminal prosecution of a PHC Entity for false statement, obstruction of justice, or perjury.

    iii) Not to use Cooperation Information against any PHC Entity at sentencing for the purpose of determining the applicable guideline range, including the appropriateness of an upward departure, or the sentence to be imposed, and to recommend to the Court that Cooperation Information not be used in determining the applicable guideline range or the sentence to be imposed. The PHC Entities understand, however, that Cooperation Information will be disclosed to the probation office and the Court, and that the Court may use Cooperation Information for the purposes set forth in U.S.S.G. § 1B1.8(b) and for determining the sentence to be imposed.

13.    It is understood and agreed that, if the USAO in its sole discretion and in good faith determines that any of the PHC Entities has committed any federal felony offense after signing this Agreement, or has otherwise violated any provision of this Agreement, that PHC entity shall be subject to prosecution for any violation of federal law of which the USAO has knowledge, including obstruction of justice. Additionally, if the USAO in its sole discretion and in good faith determines that the PHC Entities breached this agreement, then the USAO may bring to the Court's attention the breach and seek to terminate the deferral of the prosecution of PHC and to pursue the deferred charge contained in Exhibit 2.

14.    It is further understood and agreed that all statutes of limitation are tolled for six years from the date of the execution of this agreement, under the following terms:

    a.    For any and all of the offenses described in subparagraph (b) below, the period of time from the date of execution of this agreement, through and including a date six years after the date of execution, shall be excluded from any calculation of time for the purposes of (a) applying any applicable federal statute(s) of limitations, and (b) any constitutional, statutory, or common law defense, claim, or argument relating to pre-indictment delay.

    b.    The tolling applies to any federal criminal offense arising from, relating to, or based upon the Factual Basis, including any of the following:

        i.    Payments pursuant to Consultant Services Agreements entered by any of the PHC Entities, or any other formal or informal agreement, arrangement or understanding with an individual or entity that acted as a marketer or as a source of Medicare or Medi-Cal patient referrals to any hospital operated by one of the PHC Entities.

        ii.    Claims to Medicare and/or Medi-Cal for in-patient hospitals stays and services to patients referred as a result of any such agreement or arrangement.

        iii.    Obstruction of justice.

Such offenses include, but are not limited to, violations of 18 U.S.C. §§ 371, 1035, 1347, 1349, and 1501-1521, and 42 U.S.C. § 1320a-7b.

15.    If the USAO in its sole discretion determines that a PHC Entity has committed any federal felony offense after signing this Agreement; that a PHC Entity has given false, incomplete, or misleading testimony or information at any time; or that a PHC Entity has otherwise violated any provision of this Agreement, then: (a) all statements and admissions made by the PHC Entity to the USAO or other designated law enforcement agents, including the facts as agreed to in this Agreement, and any testimony given by a PHC Entity or its agent before a grand jury or other tribunal, whether prior or subsequent to the signing of this Agreement, and any leads derived from such statements or testimony shall be admissible in evidence in any criminal proceeding brought against the PHC Entity; and (b) the PHC Entity shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule that such statements or any leads therefrom are inadmissible

or should be suppressed.  By signing this Agreement, the PHC Entities waive all rights in the foregoing respects.

16.    The PHC Entities agree that their obligations in this Agreement shall run to any purchaser of a majority (at least 50% in value) of a PHC Entity's assets, and to any other acquirer including those subject to successorship liability under California law, and that the PHC Entities will include a provision in any sale, transfer, or merger agreement binding the purchaser, successor, or surviving party to the PHC Entity's obligations under this Agreement.

17.    This Agreement does not bind any federal, state, local or foreign criminal prosecuting authority other than the USAO.

18.    With respect to this criminal investigation and deferred prosecution, from the date of this Agreement forward, this Agreement supersedes all prior understandings, promises, and/or conditions, if any, between the USAO and the PHC Entities.  No additional promises, agreements, and condition have been entered into other than those set forth in this Agreement and none will be entered into unless in writing and signed by all parties.

DATED: April 20, 2012                    ANDRÉ BIROTTE JR.
                                         United States Attorney


                                         CONSUELO S. WOODHEAD
                                         Assistant United States Attorney
                                         Deputy Chief, Major Frauds Section
                                         Central District of California


                                         EVAN J. DAVIS
                                         Assistant United States Attorney
                                         Major Frauds Section
                                         Central District of California


        I, the undersigned, am an officer as stated below and have authority to sign and bind the PHC Entity identified below and its subsidiaries.  On behalf of the PHC Entity on whose behalf I am signing this agreement and its subsidiaries: I have read this Deferred Prosecution Agreement carefully; I have discussed it fully with the attorneys for the PHC Entity, Duane R. Lyons and Mark Hardiman; I understand the terms of this Deferred Prosecution Agreement; I knowingly and voluntarily agree to these terms after thorough discussion with Mr. Lyons and Mr. Hardiman; I do so without force, threats, or coercion; no promises, representations, agreements,

commitments, or inducements have been made except those set forth in this Deferred Prosecution Agreement; and I am satisfied with the PHC Entity's attorney's representation in this matter.

DATED: April 27, 2012

Michael Choo, President and CEO
Authorized Agent
Pacific Health Corporation

DATED: April 27, 2012

Michael Choo, President and CEO
Authorized Agent
Aesculap Hospital Corporation

DATED: April 27, 2012

Michael Choo, President and CEO
Authorized Agent
Anaheim General Hospital Corporation

DATED: April 27, 2012

Michael Choo, President and CEO
Authorized Agent
AMISUB Incorporated

DATED: April 27, 2012

Michael Choo, President and CEO
Authorized Agent
Anaheim General Partnership Limited

DATED: April 27 2012

Michael Choo, President and CEO
Authorized Agent
Los Angeles Doctors Corporation

DATED: April 27, 2012

Michael Choo, President and CEO
Authorized Agent
    Tustin Hospital and Medical Center

DATED: April 27, 2012

Michael Choo, President and CEO
Authorized Agent
    Tustin Surgicenter Limited

    I have carefully reviewed and discussed this Deferred Prosecution Agreement with my clients, the PHC Entities.  To the best of my knowledge, they enter into this Deferred Prosecution Agreement knowingly and voluntarily.

DATED: April 27, 2012

DUANE R. LYONS
Quinn Emanuel Urquhart & Sullivan, LLP
Attorney for the PHC Entities

1 | ANDRÉ BIROTTE JR.
United States Attorney
2 | ROBERT E. DUGDALE
Assistant United States Attorney
3 | Chief, Criminal Division
CONSUELO S. WOODHEAD (Cal. State Bar No. 69653)
4 | EVAN J. DAVIS (Cal. State Bar No. 250484)
Assistant United States Attorneys
5 | Major Frauds Section
1100 United States Courthouse
6 | 312 North Spring Street
Los Angeles, California 90012
7 | Telephone:   (213) 894-3987/4850
Facsimile:   (213) 894-6269
8 | E-mail:      consuelo.woodhead@usdoj.gov
              evan.davis@usdoj.gov
9 |

10 | UNITED STATES DISTRICT COURT

11 | FOR THE CENTRAL DISTRICT OF CALIFORNIA

12 | UNITED STATES OF AMERICA,                    CR No. _____

13 |              Plaintiff,
                                              PLEA AGREEMENT
14 |        vs.

15 | LOS ANGELES DOCTORS HOSPITAL,
INC.,
16 |
              Defendant.
17 |

18 |
          1.    This constitutes the plea agreement between Los Angeles
19 |
Doctors Hospital, Inc.("defendant" or "LADH") and the United
20 |
States Attorney's Office for the Central District of California
21 |
("the USAO") with respect to the conduct described in the Factual
22 |
Basis of this agreement. This agreement is limited to the USAO
23 |
and cannot bind any other federal, state, local, or foreign
24 |
prosecuting, enforcement, administrative, or regulatory
25 |
authorities.
26 |
          2.    Defendant understands and agrees that this Agreement is
27 |
part of a "package deal" in which the disposition of the case
28 |

EXHIBIT A-1

1    against defendant is tied to and conditioned on the agreement of
2    Pacific Health Corporation and other related entities to be
3    jointly and severally liable for the payment of defendant's
4    restitution and to cooperate fully in the investigation and
5    prosecution of others, as set forth in the letter agreement for
6    deferred prosecution ("the Letter Agreement") attached hereto as
7    Exhibit A, which must be fully executed before this agreement
8    takes effect.  Defendant acknowledges that defendant has
9    discussed with defendant's attorney and carefully considered the
10   possible advantages and disadvantages to defendant of entering
11   into this Agreement as part of the package deal; and that
12   defendant is entering into this Agreement as part of the package
13   deal freely and voluntarily and not because of threats, coercion,
14   or other undue influence by the USAO or by any of the entities
15   who are part of the package deal, their counsel, or anyone acting
16   on their behalf.

                        DEFENDANT'S OBLIGATIONS

17
18        2.   Defendant agrees to:
19             a) Give up the right to indictment by a grand jury and,
20   at the earliest opportunity requested by the USAO and provided by
21   the Court, appear and plead guilty to a one-count information in
22   the form attached to this agreement as Exhibit B or a
23   substantially similar form.  Defendant enters into this
24   agreement, and will enter its guilty plea before the Court,
25   through an officer, agent, or attorney authorized to so act.
26             b) Not contest facts agreed to in this agreement.
27             c) Abide by all agreements regarding facts and
28   sentencing factors contained in this agreement.

                                   2

1         d) Appear for all court appearances and obey any other

2    ongoing court order in this matter.

3         e) Not commit any crime.

4         f) Be truthful at all times with Pretrial Services, the

5    United States Probation Office, and the Court.

6         g) Pay the applicable special assessment at or before

7    the time of sentencing.

8         h) Not seek the discharge of any restitution

9    obligation, in whole or in part, in any present or future

10   bankruptcy proceeding.

11       3.   Defendant further agrees to cooperate fully with the

12   USAO, the Department of Health and Human Services Office of

13   Inspector General, the Federal Bureau of Investigation, the

14   Internal Revenue Service, and, as directed by the USAO, any other

15   federal, state, local, or foreign prosecuting, enforcement,

16   administrative, or regulatory authority.  This cooperation

17   requires defendant to:

18        a) Provide complete and truthful disclosure of all

19   non-privileged information as may be requested by the USAO or its

20   designee with respect to the activities of defendant and its

21   subsidiaries and its and theirs present and former officers,

22   employees, and agents;

23        b) Assemble, organize, and produce voluntarily all

24   documents, records, or other tangible evidence relating to

25   matters about which the USAO or its designee, inquires, including

26   documents in the possession, custody or control of its

27   subsidiaries;

28

3

1    c) Use its best efforts to facilitate the
2 availability of its present and former officers, employees, and
3 agents to provide information and/or testimony as requested by
4 the USAO or its designee, including attendance at all witness
5 interviews, grand jury sessions, trials, and other proceedings;
6 and

7    d) Provide testimony and other information deemed
8 necessary by the USAO or a court to identify or establish the
9 original location, authenticity, or other evidentiary foundation
10 necessary to admit into evidence documents in any proceeding as
11 requested by the Offices.

12    Nothing in this agreement shall require defendant to waive
13 any protections of the attorney-client privilege, attorney work-
14 product doctrine, or any other applicable privilege. Nor shall
15 anything in this agreement preclude the government from seeking
16 an order authorizing or requiring the disclosure of
17 communications over which defendant may claim a privilege,
18 including in the event that an individual defendant asserts that
19 he or she relied in good faith on advice of counsel provided to
20 defendant or one of its subsidiaries.

21    4.    For purposes of this agreement: (1) "Cooperation
22 Information" shall mean any statements made, or documents,
23 records, tangible evidence, or other information provided, by
24 defendant pursuant to defendant's cooperation under this
25 agreement; and (2) "Plea Information" shall mean any statements
26 made by defendant, under oath, at the guilty plea hearing and the
27 agreed to factual basis statement in this agreement.

28

THE USAO'S OBLIGATIONS

5.    The USAO agrees to:

a) Not contest facts agreed to in this agreement.

b) Abide by all agreements regarding sentencing factors contained in this agreement.

c) At the time of sentencing, provided that defendant has fully cooperated in the investigation and clearly demonstrated an acceptance of responsibility for the offense up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guideline culpability score, pursuant to U.S.S.G. § 8C2.5(g)(2).

d) Recommend to the Court that defendant's obligation to make restitution shall be subject to the same payment schedule set forth in any settlement of civil claims under the civil False Claims Act for the conduct described in the Factual Basis.

6.    The USAO further agrees:

a) Not to offer as evidence in its case-in-chief in the above-captioned case or any other criminal prosecution that may be brought against defendant by the USAO, or in connection with any sentencing proceeding in any criminal case that may be brought against defendant by the USAO, any Cooperation Information. Defendant agrees, however, that the USAO may use both Cooperation Information and Plea Information: (1) to obtain and pursue leads to other evidence, which evidence may be used for any purpose, including any criminal prosecution of defendant; (2) to cross-examine defendant should defendant testify, or to rebut any evidence offered, or argument or representation made, by defendant, defendant's counsel, or a witness called by

1 defendant in any trial, sentencing hearing, or other court

2 proceeding; and (3) in any criminal prosecution of defendant for

3 false statement, obstruction of justice, or perjury.

4          b) Not to use Cooperation Information against

5 defendant at sentencing for the purpose of determining the

6 applicable guideline range, including the appropriateness of an

7 upward departure, or the sentence to be imposed, and to recommend

8 to the Court that Cooperation Information not be used in

9 determining the applicable guideline range or the sentence to be

10 imposed. Defendant understands, however, that Cooperation

11 Information will be disclosed to the probation office and the

12 Court, and that the Court may use Cooperation Information for the

13 purposes set forth in U.S.S.G. § 1B1.8(b) and for determining the

14 sentence to be imposed.

15                    NATURE OF THE OFFENSE

16     7.   Defendant understands that for defendant to be guilty

17 of the crime charged in the Information, which is a violation of

18 Title 18, United States Code, Section 371, Conspiracy to Pay

19 Illegal Remunerations for Patient Referrals, the following must

20 be true: (1) beginning in or about July 2003, and ending in or

21 about May 2008, there was an agreement between two or more

22 persons to pay and receive illegal remunerations for patient

23 referrals, in violation of Title 42, United States Code, Section

24 1320a-7b(b)(2)(A); (2) defendant became a member of the

25 conspiracy knowing its object and intending to accomplish it; and

26 (3) a member of the conspiracy performed an overt act for the

27 purpose of carrying out the conspiracy. Proving a violation of

28 Title 42, United States Code, Section 1320a-7b(b)(2)(A), requires

1  proving the following three elements: (1) the defendant offered

2  or paid remuneration in cash or kind to a person; (2) the

3  defendant offered or paid the remuneration in return for the

4  referrals of an individual for the furnishing of a service for

5  which payment may be made under a Federal health care program;

6  (3) the defendant acted knowingly and willfully, that is, with

7  knowledge of the law and the specific intent to violate it.

8  Defendant admits that defendant is, in fact, guilty of this

9  offense as described in the one-count information.

PENALTIES AND RESTITUTION

10

11      8.   Defendant understands that the statutory maximum the

12  Court can impose on an organization for the offense to which

13  defendant is pleading guilty is: (a) a fine of $500,000 or twice

14  the gross gain or twice the gross loss resulting from the

15  offense, whichever is greatest; (b) a term of probation of five

16  years; and (c) a mandatory special assessment of $400.

17      9.   Defendant understands that defendant will be required

18  to pay full restitution to the victims of the offense. The

19  parties stipulate that the applicable amount of restitution is

20  $15,947,785 for Medicare and Medi-Cal combined. The parties also

21  agree that payments made to the government in satisfaction of any

22  civil resolution of claims under the False Claims Act, 31 U.S.C.

23  § 3729, based upon the conduct set forth in the Factual Basis of

24  this agreement, shall be deemed payments toward restitution.

25      10.  Defendant understands that the conviction in this case

26  may also subject defendant to various other collateral

27  consequences, including but not limited to mandatory exclusion

28  from federal health care programs for a minimum of five years,

1  suspension or revocation of any license or status granted by

2  government agencies, and revocation of probation in another case.

3  Defendant understands that unanticipated collateral consequences

4  to itself or any related or successor entity will not serve as

5  grounds to withdraw defendant's guilty plea.

6                              FACTUAL BASIS

7       11.   Defendant and the USAO agree to the statement of facts

8  provided below. Defendant and the USAO agree that this statement

9  of facts is sufficient to support a plea of guilty to the charge

10  described in this agreement and to establish the Sentencing

11  Guidelines factors set forth in paragraph 13 below but is not

12  meant to be a complete recitation of all facts relevant to the

13  underlying criminal conduct or all facts known to either party

14  that relate to that conduct.

15     Background

16          Defendant is a California corporation with its
         principal place of business in Los Angeles, California and
17        is a subsidiary of Pacific Health Corporation ("PHC"), a
         Georgia Corporation.  J.W.Y. was the Chief Executive Officer
18        and Chairman of the Board of LADH and PHC.

19
            From no later than July 2003 through no earlier than
20        May 2008, PHC was in the business of operating hospitals,
         including Los Angeles Doctors Corporation, doing business as
21        Los Angeles Metropolitan Medical Center ("LAMMC"), Tustin
         Hospital and  Medical Center, a California corporation,
22        doing business as Newport Specialty Hospital (formerly doing
         business as Tustin Hospital and Medical Center)
23        (collectively "THMC"), and Aesculap Hospital Corporation,
         AMISUB Inc., Anaheim General Hospital Corporation and
24        Anaheim General Hospital, Ltd, a California limited
         partnership, doing business as Anaheim General Hospital
25        ("Anaheim") (collectively "the Hospitals"), which it operated
         through subsidiaries. During this time, defendant provided
26        payroll services to LAMMC.
27
            During this time, defendant, PHC, and J.W.Y. knew that

28

it was illegal to pay kickbacks for the referral of patients
for health services or that may be paid for by Medicare or
Medi-Cal, which are federal health care benefit programs,
affecting commerce, for the elderly and indigent,
respectively, and that Medicare and Medi-Cal would not pay
for services procured by kickbacks. Defendant, PHC, and
J.W.Y. also knew that Medicare and Medic-Cal only covered
medically necessary services and would not pay for services
that were medically unnecessary.

The Kickbacks Conspiracy

     Beginning in or about July 2003, and continuing to in
or about May 2008, defendant agreed with PHC, LAMMC, and
others known and unknown to participate in a conspiracy to
increase in-patient stays to the Hospitals by admitting
Medicare and Medi-Cal beneficiaries recruited by Estill
Mitts ("Mitts") and F.M. ("F.M."). In furtherance of the
conspiracy, the Hospitals paid Mitts and F.M. illegal
remunerations to recruit Medicare and Medi-Cal
beneficiaries.  At J.W.Y.'s direction, and while J.W.Y. and
defendant LADH knew that PHC and the Hospitals had obtained
patients through the payment of illegal kickbacks to Mitts
and F.M., and that LAMMC and the Hospitals were providing
medical care to the recruited patients that could not be
submitted as a valid basis to bill Medicare or Medi-Cal,
defendant LADH administered the payroll of LAMMC staff who
provided billing services for and in-patient services to the
recruited patients admitted to LAMMC, including those for
whom in-patient hospitalization was not medically necessary.
As defendant knew and intended, LAMMC and the other
Hospitals billed Medicare and Medi-Cal for in-patient
services to the illegally recruited beneficiaries, including
those for whom in-patient hospitalization was not medically
necessary.

The Assessment Center and F.M.'s Company

In furtherance of the conspiracy, Mitts owned and operated a
facility called the Assessment Center ("the Assessment
Center"), located in the City of Los Angeles in the area
commonly known as Skid Row. As defendant knew, the
Assessment Center was a site that Mitts used for the purpose
of recruiting homeless Medicare and Medi-Cal beneficiaries
for referral to local hospitals, including LAMMC and the
other Hospitals.  Also in furtherance of the conspiracy,
F.M. owned and operated a company that recruited patients
from board and care facilities located in Los Angeles and

San Bernardino Counties.  As defendant well knew, LAMMC and
the other Hospitals paid Mitts and F.M. monthly kickbacks
for the referral of recruited Medicare and Medi-Cal
beneficiaries to the Hospitals, including to LAMMC.
Defendant administered the payroll of LAMMC staff who
provided in-patient services to illegally recruited
beneficiaries, including those for whom in-patient
hospitalization was not medically necessary.

In-Patient Hospitalizations

        In furtherance of the conspiracy, the Assessment Center
and F.M.'s company would contact the Hospitals regarding the
admission of recruited Medicare and Medi-Cal beneficiaries
for in-patient stays at the Hospitals, including at LAMMC.
As defendant well knew, neither the Assessment Center nor
F.M.'s company were medical clinics, and their staffs were
not medical professionals.  As defendant well knew, no
medical professionals  were seeing the recruited
beneficiaries prior to them being referred and transported
to the Hospitals, including to LAMMC.

Overt Acts

        On or about October 3, 2006, PHC approved the issuance
of a check from THMC in the amount of $23,375 payable to
Metropolitan Healthcare, a company owned by Mitts, as
payment for Mitts' referral of recruited Medicare and Medi-
Cal beneficiaries admitted to THMC in September 2006.

        On or about October 17, 2006, PHC approved the issuance
of a check from LAMMC in the amount of $5,000 payable to
Metropolitan Healthcare, as payment for Mitts' referral of
recruited Medicare and Medi-Cal beneficiaries admitted to
LAMMC in September 2006.

        On or about October 20, 2006, PHC approved the issuance
of a check from THMC in the amount of $29,500 payable to a
company owned by F.M. as payment for F.M.'s referral of
recruited Medicare and Medi-Cal beneficiaries admitted to
the THMC in September 2006.

Total Kickback Payments and Impact on Medicare and Medi-Cal

        The total amount of illegal remunerations for patient
referrals that PHC, acting on behalf of the Hospitals,
including LAMMC, paid and caused to be paid during the
course of the conspiracy was approximately $923,616 to Mitts

and $1,460,500 to F.M., for a combined total of approximately $2,384,116.

Medicare and Medi-Cal paid the Hospitals approximately $15,947,785 for claims submitted for services provided to beneficiaries admitted as a result of illegal remunerations paid or caused to be paid by defendant to Mitts and F.M. during the course of the conspiracy.

SENTENCING FACTORS

12.   Defendant understands that in determining defendant's sentence the Court is required to consider the factors set forth in 18 U.S.C. § 3553(a)(1)-(7), including the kinds of sentence and sentencing range established under the Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crime of conviction.

13.   Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

a) Restitution order in the amount of $15,947,785, pursuant to U.S.S.G. § 8B1.1(a)(1).

b) Five years probation with a condition requiring full payment of restitution and the adoption of an effective compliance and ethics program pursuant to U.S.S.G §§ 8B1.1(a)(2), 8D1.1(a), 8D1.3(b) and 8D1.4.

14.   The parties agree that the fine computed under the Sentencing Guidelines would be higher than the statutory maximum

1  of $500,000.  Therefore, a further determination of guideline

2  fine range is unnecessary. The government reserves the right to

3  argue for a fine up to the statutory maximum and defendant

4  reserves the right to argue that it does not have the ability to

5  pay any fine in addition to restitution.

6                    WAIVER OF CONSTITUTIONAL RIGHTS

7      15.  Defendant understands that by pleading guilty,

8  defendant gives up the following rights:

9            a) The right to persist in a plea of not guilty.

10           b) The right to a speedy and public trial by jury.

11           c) The right to be presumed innocent and to have the

12  burden of proof placed on the government to prove defendant

13  guilty beyond a reasonable doubt.

14           d) The right to confront and cross-examine witnesses

15  against defendant.

16           e) The right to present evidence in opposition to the

17  charge, including calling witnesses and subpoenaing those

18  witnesses to testify.

19           f) The right, if defendant chose not to present

20  evidence, to have that choice not be used against defendant.

21           g) Any and all rights to pursue any affirmative

22  defenses, Fourth Amendment or Fifth Amendment claims, and other

23  pretrial motions that have been filed or could be filed.

24                    WAIVER OF APPEAL OF CONVICTION

25      16.  Defendant understands that, with the exception of an

26  appeal based on a claim that defendant's guilty plea was

27  involuntary, by pleading guilty defendant is waiving and giving

28  up any right to appeal defendant's conviction on the offense to

                                    12

1 which defendant is pleading guilty.

2                    LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

3          17.  Defendant gives up the right to appeal all of the

4  following: (a) the procedures and calculations used to determine

5  and impose any portion of the sentence; (b) the fine imposed by

6  the court, provided it is within the statutory maximum; (c) the

7  amount and terms of any restitution order, provided it requires

8  payment of no more than $15,947,785; and (d) the term of

9  probation imposed by the Court, provided it is within the

10 statutory maximum.

11         18.  The USAO agrees that, provided that all portions of the

12 sentence are at or below the statutory maximum specified above,

13 the USAO gives up its right to appeal any portion of the

14 sentence, with the exception that the USAO reserves the right to

15 appeal the amount of restitution ordered if that amount is less

16 than $15,947,785.

17                    RESULT OF WITHDRAWAL OF GUILTY PLEA

18         19.  Defendant agrees that if, after entering a guilty plea

19 pursuant to this agreement, defendant seeks to withdraw and

20 succeeds in withdrawing defendant's guilty plea on any basis

21 other than a claim and finding that entry into this plea

22 agreement was involuntary, then (a) the USAO will be relieved of

23 all of its obligations under this agreement, including in

24 particular its obligations regarding the use of Cooperation

25 Information; and (b) in any investigation, criminal prosecution,

26 or civil, administrative, or regulatory action, defendant agrees

27 that any Cooperation Information and any evidence derived from

28 any Cooperation Information shall be admissible against

                                    13

1  defendant, and defendant will not assert, and hereby waives and
2  gives up, any claim under the United States Constitution, any
3  statute, or any federal rule, that any Cooperation Information or
4  any evidence derived from any Cooperation Information should be
5  suppressed or is inadmissible.

6                        EFFECTIVE DATE OF AGREEMENT
7       20.   Subject to paragraph 2 above, this agreement is
8  effective upon signature and execution of all required
9  certifications by defendant, defendant's counsel, and an
10 Assistant United States Attorney.

11                         BREACH OF AGREEMENT
12      21.   Defendant agrees that if defendant, at any time after
13 the signature of this agreement and execution of all required
14 certifications by defendant, defendant's counsel, and an
15 Assistant United States Attorney, knowingly violates or fails to
16 perform any of defendant's obligations under this agreement ("a
17 breach"), the USAO may declare this agreement breached. All of
18 defendant's obligations are material, a single breach of this
19 agreement is sufficient for the USAO to declare a breach, and
20 defendant shall not be deemed to have cured a breach without the
21 express agreement of the USAO in writing. If the USAO declares
22 this agreement breached, and the Court finds such a breach to
23 have occurred, then:
24           a) If defendant has previously entered a guilty plea
25 pursuant to this agreement, defendant will not be able to
26 withdraw the guilty plea.
27           b) The USAO will be relieved of all its obligations
28 under this agreement; in particular, the USAO: (i) will no longer

                                  14

1  be bound by any agreements concerning sentencing and will be free

2  to seek any sentence up to the statutory maximum for the crime to

3  which defendant has pleaded guilty; and (ii) will no longer be

4  bound by any agreement regarding the use of Cooperation

5  Information and will be free to use any Cooperation Information

6  in any way in any investigation, criminal prosecution, or civil,

7  administrative, or regulatory action.

8      c) The USAO will be free to criminally prosecute

9  defendant for false statement, obstruction of justice, and

10  perjury based on any knowingly false or misleading statement by

11  defendant.

12      d) In any investigation, criminal prosecution, or

13  civil, administrative, or regulatory action, defendant agrees

14  that any Cooperation Information and any Plea Information, as

15  well as any evidence derived from any Cooperation Information or

16  any Plea Information, shall be admissible against defendant, and

17  defendant will not assert, and hereby waives and gives up, any

18  claim under the United States Constitution, any statute, Rule 410

19  of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules

20  of Criminal Procedure, or any other federal rule, that any

21  Cooperation Information, any Plea Information, or any evidence

22  derived from any Cooperation Information or any Plea Information

23  should be suppressed or is inadmissible.

24      22.  In addition, following the Court's finding of a knowing

25  and willful breach of this agreement by defendant, should the

26  USAO elect to pursue any charge that was not filed as a result of

27  this agreement, then:

28      (a) defendant agrees that any applicable statute of

15

1  limitations is tolled between the date of defendant's signing of

2  this agreement and the commencement of any such prosecution or

3  action; and

4          (b) defendant gives up all defenses based on the

5  statute of limitations, any claim of pre-indictment delay, or any

6  speedy trial claim with respect to any such prosecution, except

7  to the extent that such defenses existed as of the date of

8  defendant's signing this agreement.

9                  COURT AND PROBATION OFFICE NOT PARTIES

10      23.  Defendant understands that the Court and the United

11  States Probation Office are not parties to this agreement and

12  need not accept any of the USAO's sentencing recommendations or

13  the parties' agreements to facts or sentencing factors.

14      24.  Defendant understands that both defendant and the USAO

15  are free to: (a) supplement the facts by supplying relevant

16  information to the United States Probation Office and the Court,

17  (b) correct any and all factual misstatements relating to the

18  Court's Sentencing Guidelines calculations, and (c) argue on

19  appeal and collateral review that the Court's Sentencing

20  Guidelines calculations are not error, although each party agrees

21  to maintain its view that the calculations in paragraph 13

22  are consistent with the facts of this case. While this paragraph

23  permits both the USAO and defendant to submit full and complete

24  factual information to the United States Probation Office and the

25  Court, even if that factual information may be viewed as

26  inconsistent with the facts agreed to in this agreement, this

27  paragraph does not affect defendant's and the USAO's obligations

28  not to contest the facts agreed to in this agreement.

1

2      25.  Defendant understands that even if the Court ignores

3  any sentencing recommendation, finds facts or reaches conclusions

4  different from those agreed to, and/or imposes any sentence up to

5  the maximum established by statute, defendant cannot, for that

6  reason, withdraw defendant's guilty plea, and defendant will

7  remain bound to fulfill all defendant's obligations under this

8  agreement. Defendant understands that no one -- not the

9  prosecutor, defendant's attorney, or the Court -- can make a

10  binding prediction or promise regarding the sentence defendant

11  will receive, except that it will be within the statutory

12  maximum.

13                    NO ADDITIONAL AGREEMENTS

14      26.  Defendant understands that, except as set forth herein,

15  there are no promises, understandings, or agreements between the

16  USAO and defendant or defendant's attorney, and that no

17  additional promise, understanding, or agreement may be entered

18  into unless in a writing signed by all parties or on the record

19  in court.

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

1    PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

2        27.  The parties agree that this agreement will be

3    considered part of the record of defendant's guilty plea hearing

4    as if the entire agreement had been read into the record of the

5    proceeding.

6

7    AGREED AND ACCEPTED

8    UNITED STATES ATTORNEY'S OFFICE
     FOR THE CENTRAL DISTRICT OF CALIFORNIA
9
     ANDRÉ BIROTTE JR.
10   United States Attorney

11
     _____        _____
12   CONSUELO S. WOODHEAD                     Date
     Assistant United States Attorney
13

14                                           4/27/12
     _____        _____
15   MICHAEL CHOO                             Date
     President and CEO
16   Authorized Agent for
     Defendant LOS ANGELES DOCTORS
17   HOSPITAL, INC.

18

19   _____        _____
     DUANE LYONS                             Date
20   Quinn Emanuel Urquhart & Sullivan, LLP
     Attorney for Defendant
21   LOS ANGELES DOCTORS HOSPITAL, INC.

22

23

24

25

26

27

28

1    <u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

2    27.  The parties agree that this agreement will be

3    considered part of the record of defendant's guilty plea hearing

4    as if the entire agreement had been read into the record of the

5    proceeding.

6

7    AGREED AND ACCEPTED

8    UNITED STATES ATTORNEY'S OFFICE
     FOR THE CENTRAL DISTRICT OF CALIFORNIA
9
     ANDRÉ BIROTTE JR.
10   United States Attorney

11

12   _____         _____
     CONSUELO S. WOODHEAD                     Date
13   Assistant United States Attorney

14

     _____         _____
15   MICHAEL CHOO                             Date
     President and CEO
16   Authorized Agent for
     Defendant LOS ANGELES DOCTORS
17   HOSPITAL, INC.

18

19   _____         4/27/12
     DUANE LYONS                              Date
20   Quinn Emanuel Urquhart & Sullivan, LLP
     Attorney for Defendant
21   LOS ANGELES DOCTORS HOSPITAL, INC.

22

23

24

25

26

27

28

                              18

CERTIFICATION OF DEFENDANT

I, the undersigned, am an officer as stated below and have authority to sign and bind Los Angeles Doctors Hospital, Inc. ("LADH"). On behalf of Los Angeles Doctors Hospital, Inc., I state the following. I have read this agreement in its entirety. The governing board of LADH and I have had enough time to review and consider this agreement, and have carefully and thoroughly discussed every part of it with counsel for LADH, Duane Lyons and Mark Hardiman. I understand the terms of this agreement, and LADH voluntarily agrees to those terms. I have discussed the evidence with my attorney, and counsel for LADH who has advised LADH of its rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me or LADH other than those contained in this agreement. No one has threatened or forced LADH in any way to enter into this agreement. LADH and I are satisfied with the representation of LADH's attorneys in this matter, and LADH is pleading guilty because LADH is guilty of the charge and wishes to take advantage

19

1 of the promises set forth in this agreement, and not for any
2 other reason.

3 _____          4/27/12
4 MICHAEL CHOO                      Date
  President and CEO
5 Authorized Agent for
  Defendant LOS ANGELES DOCTORS
6 HOSPITAL, INC.

7

8            CERTIFICATION OF DEFENDANT'S ATTORNEY
9      I am Los Angeles Doctors Hospital, Inc.'s attorney.  I have
10 carefully and thoroughly discussed every part of this agreement
11 with my client.  Further, I have fully advised my client of its
12
13 rights, of possible pretrial motions that might be filed, of
14 possible defenses that might be asserted either prior to or at
15 trial, of the sentencing factors set forth in 18 U.S.C.
16 § 3553(a), of relevant Sentencing Guidelines provisions, and of
17 the consequences of entering into this agreement.  To my
18 knowledge: no promises, inducements, or representations of any
19 kind have been made to my client other than those contained in
20
21 this agreement; no one has threatened or forced my client in any
22 way to enter into this agreement; my client's decision to enter
23 into this agreement is an informed and voluntary one; and the
24 factual basis set forth in this agreement is sufficient to
25
26
27
28

                            20

1   support my client's entry of a guilty plea pursuant to this

2   agreement.

3

4   _____            4/27/12

5   DUANE LYONS                        Date
    Quinn Emanuel Urquhart & Sullivan, LLP
6   Attorney for Defendant
    LOS ANGELES DOCTORS HOSPITAL, INC.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

2       27.   The parties agree that this agreement will be

3   considered part of the record of defendant's guilty plea hearing

4   as if the entire agreement had been read into the record of the

5   proceeding.

6

7   AGREED AND ACCEPTED

8   UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF CALIFORNIA
9
    ANDRÉ BIROTTE JR.
10  United States Attorney

11  _____        8/20/12
                                             _____
12  CONSUELO S. WOODHEAD                     Date
    Assistant United States Attorney
13

14  _____        4/27/12
                                             _____
15  MICHAEL CHOO                             Date
    President and CEO
16  Authorized Agent for
    Defendant LOS ANGELES DOCTORS
17  HOSPITAL, INC.

18

19  _____        _____
    DUANE LYONS                              Date
20  Quinn Emanuel Urquhart & Sullivan, LLP
    Attorney for Defendant
21  LOS ANGELES DOCTORS HOSPITAL, INC.

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9          FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,    )    CR No.
                                  )
12                   Plaintiff,   )    I N F O R M A T I O N
                                  )
13              v.                )    [18 U.S.C. § 371: Conspiracy to
                                  )    Pay Kickbacks for Patient
14   PACIFIC HEALTH CORPORATION,  )    Referrals in Violation of 42
                                  )    U.S.C. § 1320a-7b(b)(2)(A)]
15                   Defendant.   )
                                  )
16                                )
                                  )
17                                )
                                  )
18   ─────────────────────────── )

19        The United States Attorney charges:

20                          COUNT ONE

21                  [18 U.S.C. §§ 371 and 2(b)]

22   A.   INTRODUCTORY ALLEGATIONS

23        At all times relevant to this Information:

24        1.  Defendant PACIFIC HEALTH CORPORATION ("PHC") was a

25   Georgia corporation with its principal place of business in

26   Tustin, California, within the Central District of California.

27        2.  Defendant PHC was in the business of operating

28   hospitals, including Los Angeles Metropolitan Medical Center,

EXHIBIT A-2

1  Tustin Hospital and Medical Center, and Anaheim General Hospital

2  ("the Hospitals"), which it operated through subsidiaries.

3       The Medicare and Medi-Cal Programs

4       3.  Medicare was a federally funded national health care

5  benefit program, affecting commerce, that provided reimbursement

6  for health care services to the elderly and certain disabled

7  persons.

8       4.  Medi-Cal was a health care benefit program, affecting

9  commerce, that provided reimbursement for health care services to

10  indigent persons in California.  Funding for Medi-Cal was shared

11  between the federal government and the State of California.

12  Hospitals in California were generally reimbursed based upon a

13  negotiated contract rate.

14       5.  Individuals who qualified for Medicare or Medi-Cal

15  benefits were commonly referred to as "beneficiaries."

16       6.  Medicare and Medi-Cal reimbursed hospitals, physicians,

17  and other health care providers for medically necessary treatment

18  and services rendered to their respective beneficiaries.

19       7.  To reimburse a provider for inpatient hospital stays,

20  Medicare and Medi-Cal required a prescription or order by a

21  physician.

22  B.  OBJECT OF THE CONSPIRACY

23       8.  Beginning in or about July 2003, and continuing to in or

24  about September 2007, in Los Angeles County and Orange County,

25  within the Central District of California, and elsewhere,

26  defendant, the Hospitals, Estill Mitts ("Mitts"), and F.M.,

27  together with others known and unknown to the Grand Jury,

28  knowingly combined, conspired, and agreed to pay kickbacks for

2

1   patient referrals, in violation of Title 42, United States Code,

2   Section 1320a-7b(b)(2)(A).

3   C.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE

4        ACCOMPLISHED

5        9.   The object of the conspiracy was carried out, and to be

6   carried out, in substance, as follows:

7             a.   Mitts established a facility called the Assessment

8   Center, also known as the 7th Street Christian Day Center,

9   located at 431 East Seventh Street, Los Angeles, California, in

10  the area commonly known as "Skid Row."  Mitts used the Assessment

11  Center as a site for recruiting homeless Medicare and Medi-Cal

12  beneficiaries for referral to the Hospitals.

13            b.   F.M. established a company that he used to recruit

14  Medicare and Medi-Cal beneficiaries from board and care

15  facilities in Los Angeles and San Bernardino Counties for

16  referral to the Hospital.

17            c.   Mitts, F.M., and other co-conspirators working for

18  them referred the Medicare and Medi-Cal beneficiaries (the

19  "recruited beneficiaries") for inpatient admissions at the

20  Hospitals regardless of the medical necessity of such admissions.

21            d.   Mitts, F.M., and other co-conspirators working for

22  them arranged to transport the recruited beneficiaries from their

23  locations in Los Angeles County and San Bernardino County to the

24  Hospitals.

25            e.   Co-conspirator physicians admitted the recruited

26  beneficiaries to the Hospitals regardless of the medical

27  necessity of such admissions, and ordered unnecessary tests and

28  services for them.

3

1      f.    PHC provided funds to pay companies owned by Mitts
2  and F.M. for the referral of the recruited beneficiaries admitted
3  to the Hospitals and the Hospitals issued checks ("kickback
4  payments") for such referrals.

5      g.    PHC approved and the Hospitals executed sham
6  "consultant" contracts with Mitts and F.M. to conceal the fact
7  that the Hospitals were making kickback payments to them for the
8  referral of the recruited beneficiaries.

9      h.    Mitts and F.M. created false "work reports"
10 pursuant to the sham contracts to disguise and justify such
11 illegal kickback payments.

12     i.    The Hospital billed Medicare and Medi-Cal for
13 hospital stays and related services provided to the recruited
14 beneficiaries, including admissions and services that were
15 medically unnecessary.

16     j.    Medicare and Medi-Cal paid the Hospital for in-
17 patient stays and related services that would not have been
18 ordered or provided by the Hospital but for the kickback
19 payments.

20 D.    OVERT ACTS

21     10.   In furtherance of the conspiracy and to accomplish its
22 object, defendant PHC, the Hospitals, Mitts, and F.M., together
23 with others known and unknown to the Grand Jury, committed and
24 willfully caused others to commit the following overt acts, among
25 others, within the Central District of California and elsewhere:

26 Overt Act No. 1:  On or about October 3, 2006, PHC approved
27 and Tustin Hospital and Medical Center issued a check in the
28 amount of $23,375, payable to Metropolitan Healthcare, a company

4

1   owned by Mitts, as payment for Mitts' referral of recruited

2   Medicare and Medi-Cal beneficiaries admitted to the Hospital in

3   September 2006.

4       Overt Act No. 2:   On or about October 17, 2006, PHC

5   approved and Los Angeles Metropolitan Medical Center issued a

6   check in the amount of $5,000 payable to Metropolitan Healthcare

7   a company owned by Mitts, as payment for Mitts' referral of

8   recruited Medicare and Medi-Cal beneficiaries admitted to the

9   Hospital in September 2006.

10      Overt Act No. 3:  On or about October 20, 2006, PHC approved

11  and Tustin Hospital and Medical Center issued a check in the

12  amount of $29,500, payable to a company owned by F.M., as payment

13  for F.M.'s referral of recruited Medicare and Medi-Cal

14  beneficiaries to the Hospital in September 2006.

15                          ANDRÉ BIROTTE JR.
                            United States Attorney
16

17

18                          ROBERT E. DUGDALE
                            Assistant United States Attorney
                            Chief, Criminal Division
19

20                          BEONG-SOO KIM
                            Assistant United States Attorney
                            Chief, Major Frauds Section
21

22                          CONSUELO S. WOODHEAD
                            Assistant United States Attorney
                            Deputy Chief, Major Frauds Section
23

24                          EVAN J. DAVIS
                            Assistant United States Attorney
                            Major Frauds Section
25

26

27

28

CORPORATE INTEGRITY AGREEMENT
BETWEEN THE
OFFICE OF INSPECTOR GENERAL
OF THE
DEPARTMENT OF HEALTH AND HUMAN SERVICES
AND
PACIFIC HEALTH CORP

## I.    PREAMBLE

Pacific Health Corp (PHC) hereby enters into this Corporate Integrity Agreement (CIA) with the Office of Inspector General (OIG) of the United States Department of Health and Human Services (HHS) to promote compliance with the statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) (Federal health care program requirements). Contemporaneously with this CIA, PHC is entering into a Settlement Agreement with the United States.

## II.    TERM AND SCOPE OF THE CIA

A.    The period of the compliance obligations assumed by PHC under this CIA shall be five years from the effective date of this CIA. The "Effective Date" shall be the date on which the final signatory of this CIA executes this CIA, unless otherwise specified. Each one-year period, beginning with the one-year period following the Effective Date, shall be referred to as a "Reporting Period."

B.    Sections VII, X, and XI shall expire no later than 120 days after OIG's receipt of: (1) PHC's final annual report; or (2) any additional materials submitted by PHC pursuant to OIG's request, whichever is later.

C.    The scope of this CIA shall be governed by the following definitions:

1.    "Arrangements" shall mean every arrangement or transaction that:

1

EXHIBIT A-3

a.  involves, directly or indirectly, the offer, payment, solicitation, or receipt of anything of value; and is between PHC and any actual or potential source of health care business or referrals to PHC or any actual or potential recipient of health care business or referrals from PHC. The term "source of health care business or referrals" shall mean any individual or entity that refers, recommends, arranges for, orders, leases, or purchases any good, facility, item, or service for which payment may be made in whole or in part by a Federal health care program and the term "recipient of health care business or referrals" shall mean any individual or entity (1) to whom PHC refers an individual for the furnishing or arranging for the furnishing of any item or service, or (2) from whom PHC purchases, leases or orders or arranges for or recommends the purchasing, leasing, or ordering of any good, facility, item, or service for which payment may be made in whole or in part by a Federal health care program; or

b.  is between PHC and a physician (or a physician's immediate family member (as defined at 42 C.F.R. § 411.351)) who makes a referral (as defined at 42 U.S.C. § 1395nn(h)(5)) to PHC for designated health services (as defined at 42 U.S.C. § 1395nn(h)(6)).

2.  "Focus Arrangements" means every Arrangement that:

a.  is between PHC and any actual source of health care business or referrals to PHC and involves, directly or indirectly, the offer, payment, or provision of anything of value; or

b.  is between PHC and any physician (or a physician's immediate family member) (as defined at 42 C.F.R. § 411.351)) who makes a referral (as defined at 42 U.S.C. § 1395nn(h)(5)) to PHC for designated health services (as defined at 42 U.S.C. §1395nn(h))(6)).

Notwithstanding the foregoing provisions of Section II.C.2, any Arrangement that satisfies the requirements of 42 C.F.R. § 411.356 (ownership or investment interests), 42 C.F.R. § 411.357(g) (remuneration unrelated to the provision of designated health services); 42 C.F.R. § 411.357(i) (payments by a physician for items and services); 42 C.F.R. § 411.357(k) (non-monetary compensation); 42 C.F.R. § 411.357(m) (medical staff incidental benefits), 42 C.F.R. § 411.357(o) (compliance training), 42 C.F.R. § 411.357(q) (referral services), 42 C.F.R. § 411.357(s) (professional courtesy), 42 C.F.R. § 357(u) (community-wide health information systems), or any exception to the prohibitions of 42 U.S.C. § 1395nn enacted following the Effective Date that does not require a written agreement shall not be considered a Focus Arrangement for purposes of this CIA.

    3.    "Covered Persons" includes:

        a.    all owners, officers, directors, and employees of PHC; and

        b.    all contractors, subcontractors, agents, and other persons who provide patient care items or services or who perform billing or coding functions on behalf of PHC excluding vendors whose sole connection with PHC is selling or otherwise providing medical supplies or equipment to PHC and who do not bill the Federal health care programs for such medical supplies or equipment; and

        c.    all physicians and other non-physician practitioners who are members of PHC's active medical staff.

Notwithstanding the above, this term does not include part-time or per diem employees, contractors, subcontractors, agents, and other persons who are not reasonably expected to work more than 160 hours per year, except that any such individuals shall become "Covered Persons" at the point when they work more than 160 hours during the calendar year.

    4.    "Arrangements Covered Persons" includes each Covered Person who is involved with the development, approval, management, or review of PHC's Arrangements.

III.    CORPORATE INTEGRITY OBLIGATIONS

        PHC shall establish and maintain a Compliance Program that includes the following elements:

        A.    Compliance Officer and Committee

        1.    *Compliance Officer.*  Within 90 days after the Effective Date, PHC shall appoint an individual to serve as its Compliance Officer and shall maintain a Compliance Officer for the term of the CIA.  The Compliance Officer shall be responsible for developing and implementing policies, procedures, and practices designed to ensure compliance with the requirements set forth in this CIA and with Federal health care program requirements.  The Compliance Officer shall be a member of senior management of PHC, shall report directly to the Chief Executive Officer of PHC, shall make periodic (at least quarterly) reports regarding compliance matters directly to the Board of Directors of PHC, and shall be authorized to report on such matters to the Board of Directors at any time.  The Compliance Officer shall not be or be subordinate to the General Counsel or Chief Financial Officer.  The Compliance Officer shall be responsible for monitoring the day-to-day compliance activities engaged in by PHC as well as for any reporting obligations created under this CIA.  Any noncompliance job responsibilities of the Compliance Officer shall be limited and must not interfere with the Compliance Officer's ability to perform the duties outlined in this CIA.

        PHC shall report to OIG, in writing, any changes in the identity or position description of the Compliance Officer, or any actions or changes that would affect the Compliance Officer's ability to perform the duties necessary to meet the obligations in this CIA, within five days after such a change.

        2.    *Compliance Committee.*  Within 90 days after the Effective Date, PHC shall appoint a Compliance Committee.  The Compliance Committee shall, at a minimum, include the Compliance Officer and other members of senior management necessary to meet the requirements of this CIA (e.g., senior executives of relevant departments, such as billing, clinical, human resources, audit, and operations).  The Compliance Officer shall chair the Compliance Committee and the Committee shall support the Compliance Officer in fulfilling his/her responsibilities (e.g., shall assist in the analysis of PHC's risk areas and shall oversee monitoring of internal and external audits and investigations).  The Compliance Committee shall meet at least quarterly.

PHC shall report to OIG, in writing, any changes in the composition of the Compliance Committee, or any actions or changes that would affect the Compliance Committee's ability to perform the duties necessary to meet the obligations in this CIA, within 15 days after such a change.

       3.    *Board of Directors Compliance Obligations*.  The Board of Directors (Board) shall be responsible for the review and oversight of matters related to compliance with Federal health care program requirements and the obligations of this CIA.

The Board shall, at a minimum, be responsible for the following:

    a.    meeting at least quarterly to review and oversee PHC's Compliance Program, including but not limited to the performance of the Compliance Officer and Compliance Committee;

    b.    ensuring that PHC adopts and implements policies, procedures, and practices designed to ensure compliance with the requirements set forth in this CIA and Federal health care program requirements; and

    c.    for each Reporting Period of the CIA, adopting a resolution, signed by each member of the Board summarizing its review and oversight of PHC's compliance with Federal health care program requirements and the obligations of this CIA.

At minimum, the resolution shall include the following language:

"The Board of Directors has made a reasonable inquiry into the operations of PHC's Compliance Program including the performance of the Compliance Officer and the Compliance Committee.  Based on its inquiry and review, the Board has concluded that, to the best of its knowledge, PHC has implemented an effective Compliance Program to meet Federal health care program requirements and the obligations of the CIA."

If the Board is unable to provide such a conclusion in the resolution, the Board shall include in the resolution a written explanation of the reasons why it is unable to

provide the conclusion and the steps it is taking to implement an effective Compliance Program at PHC.

PHC shall report to OIG, in writing, any changes in the composition of the Board, or any actions or changes that would affect the Board's ability to perform the duties necessary to meet the obligations in this CIA, within 15 days after such a change.

B.    Written Standards

1.    *Code of Conduct*.  Within 90 days after the Effective Date, PHC shall develop, implement, and distribute a written Code of Conduct to all Covered Persons.  PHC shall make the promotion of, and adherence to, the Code of Conduct an element in evaluating the performance of all employees.  The Code of Conduct shall, at a minimum, set forth:

a.    PHC's commitment to full compliance with all Federal health care program requirements;

b.    PHC's requirement that all of its Covered Persons shall be expected to comply with all Federal health care program requirements and with PHC's own Policies and Procedures;

c.    the requirement that all of PHC's Covered Persons shall be expected to report to the Compliance Officer, or other appropriate individual designated by PHC, suspected violations of any Federal health care program requirements or of PHC's own Policies and Procedures;

d.    the right of all individuals to use the Disclosure Program described in Section III.F, and PHC's commitment to non-retaliation and to maintain, as appropriate, confidentiality and anonymity with respect to such disclosures.

Within 90 days after the Effective Date, each Covered Person shall certify, in writing, that he or she has received, read, understood, and shall abide by PHC's Code of Conduct.  New Covered Persons shall receive the Code of Conduct and shall complete the required certification within 30 days after becoming a Covered Person or within 90 days after the Effective Date, whichever is later.

PHC shall periodically review the Code of Conduct to determine if revisions are appropriate and shall make any necessary revisions based on such review.  Any revised Code of Conduct shall be distributed within 30 days after any revisions are finalized. Each Covered Person shall certify, in writing, that he or she has received, read, understood, and shall abide by the revised Code of Conduct within 30 days after the distribution of the revised Code of Conduct.

        2.    *Policies and Procedures*.  Within 90 days after the Effective Date, PHC shall implement written Policies and Procedures regarding the operation of PHC's compliance program, including the compliance program requirements outlined in this CIA and PHC's compliance with Federal health care program requirements.  The Policies and Procedures also shall address:

    a.    42 U.S.C. § 1320a-7b(b) (Anti-Kickback Statute) and 42 U.S.C. § 1395nn (Stark Law), and the regulations and other guidance documents related to these statutes, and business or financial arrangements or contracts that generate unlawful Federal health care program business in violation of the Anti-Kickback Statute or the Stark Law; and

    b.    the requirements set forth in Section III.D (Compliance with the Anti-Kickback Statute and Stark Law).

Within 90 days after the Effective Date, the relevant portions of the Policies and Procedures shall be distributed to all Covered Persons whose job functions relate to those Policies and Procedures.  Appropriate and knowledgeable staff shall be available to explain the Policies and Procedures.

At least annually (and more frequently, if appropriate), PHC shall assess and update, as necessary, the Policies and Procedures.  Within 30 days after the effective date of any revisions, the relevant portions of any such revised Policies and Procedures shall be distributed to all Covered Persons whose job functions relate to those Policies and Procedures.

C.    <u>Training and Education</u>

    1.    *General Training*.  Within 90 days after the Effective Date, PHC shall provide at least two hours of General Training to each Covered Person.  This training, at a minimum, shall explain PHC's:

        a.    CIA requirements; and

        b.    Compliance Program, including the Code of Conduct.

    New Covered Persons shall receive the General Training described above within 30 days after becoming a Covered Person or within 90 days after the Effective Date, whichever is later.  After receiving the initial General Training described above, each Covered Person shall receive at least one hour of General Training in each subsequent Reporting Period.

    2.    *Arrangements Training*.  Within 90 days after the Effective Date, each Arrangements Covered Person shall receive at least three hours of Arrangements Training, in addition to the General Training required above.  The Arrangements Training shall include a discussion of:

        a.    Arrangements that potentially implicate the Anti-Kickback Statute or the Stark Law, as well as the regulations and other guidance documents related to these statutes;

        b.    PHC's policies, procedures, and other requirements relating to Arrangements and Focus Arrangements, including but not limited to the Focus Arrangements Tracking System, the internal review and approval process, and the tracking of remuneration to and from sources of health care business or referrals required by Section III.D of the CIA;

        c.    the personal obligation of each individual involved in the development, approval, management, or review of PHC's Arrangements to know the applicable legal requirements and the PHC's policies and procedures;

        d.    the legal sanctions under the Anti-Kickback Statute and the Stark Law; and

e.      examples of violations of the Anti-Kickback Statute and the
        Stark Law.

New Arrangements Covered Persons shall receive this training within 30 days
after the beginning of their employment or becoming Arrangements Covered Persons, or
within 90 days after the Effective Date, whichever is later.

After receiving the initial Arrangements Training described in this Section, each
Arrangements Covered Person shall receive at least two hours of Arrangements Training,
in addition to the General Training, in each subsequent Reporting Period.

3.      *Board Member Training.*  Within 90 days after the Effective Date,
PHC shall provide at least two hours of training to each member of the Board of
Directors, in addition to the General Training.  This training shall address the
responsibilities of board members and corporate governance.

New members of the Board of Directors shall receive the Board Member Training
described above within 30 days after becoming a member or within 90 days after the
Effective Date, whichever is later.

4.      *Certification.*  Each individual who is required to attend training
shall certify, in writing, or in electronic form, if applicable, that he or she has received the
required training.  The certification shall specify the type of training received and the date
received.  The Compliance Officer (or designee) shall retain the certifications, along with
all course materials.

5.      *Qualifications of Trainer.*  Persons providing the training shall be
knowledgeable about the subject area.

6.      *Update of Training.*  PHC shall review the training annually, and,
where appropriate, update the training to reflect changes in Federal health care program
requirements, any issues discovered during internal audits or the Arrangements Review,
and any other relevant information.

7.      *Computer-based Training.*  PHC may provide the training required
under this CIA through appropriate computer-based training approaches.  If PHC chooses
to provide computer-based training, it shall make available appropriately qualified and
knowledgeable staff or trainers to answer questions or provide additional information to
the individuals receiving such training.

9

D.    Compliance with the Anti-Kickback Statute and Stark Law

1.    *Focus Arrangements Procedures.*  Within 90 days after the Effective Date, PHC shall create procedures reasonably designed to ensure that each existing and new or renewed Focus Arrangement does not violate the Anti-Kickback Statute and/or the Stark Law or the regulations, directives, and guidance related to these statutes (Focus Arrangements Procedures).  These procedures shall include the following:

a.    creating and maintaining a centralized tracking system for all existing and new or renewed Focus Arrangements (Focus Arrangements Tracking System);

b.    tracking remuneration to and from all parties to Focus Arrangements;

c.    tracking service and activity logs to ensure that parties to the Focus Arrangement are performing the services required under the applicable Focus Arrangement(s) (if applicable);

d.    monitoring the use of leased space, medical supplies, medical devices, equipment, or other patient care items to ensure that such use is consistent with the terms of the applicable Focus Arrangement(s) (if applicable);

e.    establishing and implementing a written review and approval process for all Focus Arrangements, the purpose of which is to ensure that all new and existing or renewed Focus Arrangements do not violate the Anti-Kickback Statute and Stark Law, and that includes at least the following: (i) a legal review of all Focus Arrangements by counsel with expertise in the Anti-Kickback Statute and Stark Law, (ii) a process for specifying the business need or business rationale for all Focus Arrangements, and (iii) a process for determining and documenting the fair market value of the remuneration specified in the Focus Arrangement;

f.    requiring the Compliance Officer to review the Focus Arrangements Tracking System, internal review and approval process, and other Focus Arrangements Procedures on at least

an annual basis and to provide a report on the results of such review to the Compliance Committee; and

g.    implementing effective responses when suspected violations of the Anti-Kickback Statute and Stark Law are discovered, including disclosing Reportable Events and quantifying and repaying Overpayments pursuant to Sections III.I and III.J when appropriate.

2.    *New or Renewed Arrangements*.  Prior to entering into new Focus Arrangements or renewing existing Focus Arrangements, in addition to complying with the Focus Arrangements Procedures set forth above, PHC shall comply with the following requirements (Focus Arrangements Requirements):

a.    Ensure that each Focus Arrangement is set forth in writing and signed by PHC and the other parties to the Focus Arrangement;

b.    Include in the written agreement a requirement that each party to a Focus Arrangement who meets the definition of a Covered Person shall complete the Arrangements Training required by Section III.C.2 of this CIA.  Additionally, PHC shall provide each party to the Focus Arrangement with a copy of its Code of Conduct and Stark Law and Anti-Kickback Statute Policies and Procedures;

c.    Include in the written agreement a certification by the parties to the Focus Arrangement that the parties shall not violate the Anti-Kickback Statute and the Stark Law with respect to the performance of the Arrangement.

3.    *Records Retention and Access*.  PHC shall retain and make available to OIG, upon request, the Focus Arrangements Tracking System and all supporting documentation of the Focus Arrangements subject to this Section and, to the extent available, all non-privileged communications related to the Focus Arrangements and the actual performance of the duties under the Focus Arrangements.

E.    <u>Review Procedures</u>

    1.    *General Description.*

        a.    *Engagement of Independent Review Organization.* Within 90 days after the Effective Date, PHC shall engage an individual or entity (or entities), such as an accounting, auditing, law, or consulting firm (hereinafter "Independent Review Organization" or "IRO"), to perform the reviews listed in this Section III.E. The applicable requirements relating to the IRO are outlined in Appendix A to this CIA, which is incorporated by reference.

        b.    *Retention of Records.* The IRO and PHC shall retain and make available to OIG, upon request, all work papers, supporting documentation, correspondence, and draft reports (those exchanged between the IRO and PHC) related to the reviews.

        c.    *Responsibilities and Liabilities.* Nothing in this Section III.E affects PHC's responsibilities or liabilities under any criminal, civil, or administrative laws or regulations applicable to any Federal health care program including, but not limited to, the Anti-Kickback Statute and/or the Stark Law.

    2.    *Arrangements Review.* The IRO shall perform an Arrangements Review and prepare an Arrangements Review Report as outlined in Appendix B to this CIA, which is incorporated by reference.

    3.    *Unallowable Cost Review.* For the first Reporting Period, the IRO shall conduct a review of PHC's compliance with the unallowable cost provisions of the Settlement Agreement. The IRO shall determine whether PHC has complied with its obligations not to charge to, or otherwise seek payment from, federal or state payors for unallowable costs (as defined in the Settlement Agreement) and its obligation to identify to applicable federal or state payors any unallowable costs included in payments previously sought from the United States, or any state Medicaid program. This unallowable cost analysis shall include, but not be limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by

PHC or any affiliates. To the extent that such cost reports, cost statements, information reports, or payment requests, even if already settled, have been adjusted to account for the effect of the inclusion of the unallowable costs, the IRO shall determine if such adjustments were proper. In making this determination, the IRO may need to review cost reports and/or financial statements from the year in which the Settlement Agreement was executed, as well as from previous years.

      4.    *Unallowable Cost Review Report.* The IRO shall prepare a report based upon the Unallowable Cost Review performed (Unallowable Cost Review Report). The Unallowable Cost Review Report shall include the IRO's findings and supporting rationale regarding the Unallowable Costs Review and whether PHC has complied with its obligation not to charge to, or otherwise seek payment from, federal or state payors for unallowable costs (as defined in the Settlement Agreement) and its obligation to identify to applicable federal or state payors any unallowable costs included in payments previously sought from such payor.

      5.    *Validation Review.* In the event OIG has reason to believe that: (a) PHC's Arrangements Review or Unallowable Cost Review fails to conform to the requirements of this CIA; or (b) the IRO's findings or Arrangements Review or Unallowable Cost Review results are inaccurate, OIG may, at its sole discretion, conduct its own review to determine whether the Arrangements Review or Unallowable Cost Review complied with the requirements of the CIA and/or the findings or Arrangements Review or Unallowable Cost Review results are inaccurate (Validation Review). PHC shall pay for the reasonable cost of any such review performed by OIG or any of its designated agents. Any Validation Review of Reports submitted as part of PHC's final Annual Report shall be initiated no later than one year after PHC's final submission (as described in Section II) is received by OIG.

      Prior to initiating a Validation Review, OIG shall notify PHC of its intent to do so and provide a written explanation of why OIG believes such a review is necessary. To resolve any concerns raised by OIG, PHC may request a meeting with OIG to: (a) discuss the results of any Arrangements Review or Unallowable Cost Review submissions or findings; (b) present any additional information to clarify the results of the Arrangements Review or Unallowable Cost Review or to correct the inaccuracy of the Arrangements Review or Unallowable Cost Review; and/or (c) propose alternatives to the proposed Validation Review. PHC agrees to provide any additional information as may be requested by OIG under this Section III.E.5 in an expedited manner. OIG will attempt in good faith to resolve any Arrangements Review or Unallowable Cost Review issues with PHC prior to conducting a Validation Review. However, the final

determination as to whether or not to proceed with a Validation Review shall be made at the sole discretion of OIG.

      6.    *Independence and Objectivity Certification.* The IRO shall include in its report(s) to PHC a certification or sworn affidavit that it has evaluated its professional independence and objectivity and has concluded that it is, in fact, independent and objective.

    F.   <u>Disclosure Program</u>

Within 90 days after the Effective Date, PHC shall establish a Disclosure Program that includes a mechanism (<u>e.g.</u>, a toll-free compliance telephone line) to enable individuals to disclose, to the Compliance Officer or some other person who is not in the disclosing individual's chain of command, any identified issues or questions associated with PHC's policies, conduct, practices, or procedures with respect to a Federal health care program believed by the individual to be a potential violation of criminal, civil, or administrative law. PHC shall appropriately publicize the existence of the disclosure mechanism (<u>e.g.</u>, via periodic e-mails to employees or by posting the information in prominent common areas).

The Disclosure Program shall emphasize a non-retribution, non-retaliation policy, and shall include a reporting mechanism for anonymous communications for which appropriate confidentiality shall be maintained. Upon receipt of a disclosure, the Compliance Officer (or designee) shall gather all relevant information from the disclosing individual. The Compliance Officer (or designee) shall make a preliminary, good faith inquiry into the allegations set forth in every disclosure to ensure that he or she has obtained all of the information necessary to determine whether a further review should be conducted. For any disclosure that is sufficiently specific so that it reasonably: (1) permits a determination of the appropriateness of the alleged improper practice; and (2) provides an opportunity for taking corrective action, PHC shall conduct an internal review of the allegations set forth in the disclosure and ensure that proper follow-up is conducted.

The Compliance Officer (or designee) shall maintain a disclosure log, which shall include a record and summary of each disclosure received (whether anonymous or not), the status of the respective internal reviews, and any corrective action taken in response to the internal reviews.

15

G.    Ineligible Persons

    1.    *Definitions.*  For purposes of this CIA:

        a.    an "Ineligible Person" shall include an individual or entity who:

            i.    is currently excluded, debarred, suspended, or otherwise ineligible to participate in the Federal health care programs or in Federal procurement or nonprocurement programs; or

            ii.    has been convicted of a criminal offense that falls within the scope of 42 U.S.C. § 1320a-7(a), but has not yet been excluded, debarred, suspended, or otherwise declared ineligible.

        b.    "Exclusion Lists" include:

            i.    the HHS/OIG List of Excluded Individuals/Entities (available through the Internet at http://www.oig.hhs.gov); and

            ii.    the General Services Administration's List of Parties Excluded from Federal Programs (available through the Internet at http://www.epls.gov).

    2.    *Screening Requirements.*  PHC shall ensure that all prospective and current Covered Persons are not Ineligible Persons, by implementing the following screening requirements.

        a.    PHC shall screen all prospective Covered Persons against the Exclusion Lists prior to engaging their services and, as part of the hiring or contracting process, shall require such Covered Persons to disclose whether they are Ineligible Persons.

        b.    PHC shall screen all Covered Persons against the Exclusion Lists within 90 days after the Effective Date and on an annual basis thereafter.

16

c.   PHC shall implement a policy requiring all Covered Persons to disclose immediately any debarment, exclusion, suspension, or other event that makes that person an Ineligible Person.

Nothing in Section III.G affects PHC's responsibility to refrain from (and liability for) billing Federal health care programs for items or services furnished, ordered, or prescribed by an excluded person. PHC understands that items or services furnished by excluded persons are not payable by Federal health care programs and that PHC may be liable for overpayments and/or criminal, civil, and administrative sanctions for employing or contracting with an excluded person regardless of whether PHC meets the requirements of Section III.G.

3.   *Removal Requirement.* If PHC has actual notice that a Covered Person has become an Ineligible Person, PHC shall remove such Covered Person from responsibility for, or involvement with, PHC's business operations related to the Federal health care programs and shall remove such Covered Person from any position for which the Covered Person's compensation or the items or services furnished, ordered, or prescribed by the Covered Person are paid in whole or part, directly or indirectly, by Federal health care programs or otherwise with Federal funds at least until such time as the Covered Person is reinstated into participation in the Federal health care programs.

4.   *Pending Charges and Proposed Exclusions.* If PHC has actual notice that a Covered Person is charged with a criminal offense that falls within the scope of 42 U.S.C. §§ 1320a-7(a), 1320a-7(b)(1)-(3), or is proposed for exclusion during the Covered Person's employment or contract term of during the term of a physician's or other practitioner's medical staff privilege, PHC shall take all appropriate actions to ensure that the responsibilities of that Covered Person have not and shall not adversely affect the quality of care rendered to any beneficiary, patient, or resident, or any claims submitted to any Federal health care program.

H.   Notification of Government Investigation or Legal Proceedings

Within 30 days after discovery, PHC shall notify OIG, in writing, of any ongoing investigation or legal proceeding known to PHC conducted or brought by a governmental entity or its agents involving an allegation that PHC has committed a crime or has engaged in fraudulent activities. This notification shall include a description of the allegation, the identity of the investigating or prosecuting agency, and the status of such

17