investigation or legal proceeding. PHC shall also provide written notice to OIG within 30 days after the resolution of the matter, and shall provide OIG with a description of the findings and/or results of the investigation or proceedings, if any.

I.    Repayment of Overpayments

1.    *Definition of Overpayments.* For purposes of this CIA, an "Overpayment" shall mean the amount of money PHC has received in excess of the amount due and payable under any Federal health care program requirements.

2.    *Repayment of Overpayments.*

a.    If, at any time, PHC identifies any Overpayment, PHC shall repay the Overpayment to the appropriate payor (e.g., Medicare fiscal intermediary or carrier) within 30 days after identification of the Overpayment and take remedial steps within 60 days after identification (or such additional time as may be agreed to by the payor) to correct the problem, including preventing the underlying problem and the Overpayment from recurring. If not yet quantified, within 30 days after identification, PHC shall notify the payor of its efforts to quantify the Overpayment amount along with a schedule of when such work is expected to be completed. Notification and repayment to the payor shall be done in accordance with the payor's policies.

b.    Notwithstanding the above, notification and repayment of any Overpayment amount that routinely is reconciled or adjusted pursuant to policies and procedures established by the payor should be handled in accordance with such policies and procedures.

18

J.    Reportable Events

1.    *Definition of Reportable Event.* For purposes of this CIA, a "Reportable Event" means anything that involves:

a.    a substantial Overpayment;

b.    a matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program for which penalties or exclusion may be authorized;

c.    the employment of or contracting with a Covered Person who is an Ineligible Person as defined by Section III.G.1.a; or

d.    the filing of a bankruptcy petition by PHC.

A Reportable Event may be the result of an isolated event or a series of occurrences.

2.    *Reporting of Reportable Events.* If PHC determines (after a reasonable opportunity to conduct an appropriate review or investigation of the allegations) through any means that there is a Reportable Event, PHC shall notify OIG, in writing, within 30 days after making the determination that the Reportable Event exists.

3.    *Reportable Events under Section III.J.1.a.* For Reportable Events under Section III.J.1.a, the report to the OIG shall be made at the same time as the repayment to the payor required under Section III.I, and shall include:

a.    a copy of the notification and repayment to the payor required in Section III.I.2;

b.    a description of the steps taken by PHC to identify and quantify the Overpayment;

c.    a complete description of the Reportable Event, including the relevant facts, persons involved, and legal and Federal health care program authorities implicated;

        d.      a description of PHC's actions taken to correct the Reportable Event; and

        e.      any further steps PHC plans to take to address the Reportable Event and prevent it from recurring.

4.    *Reportable Events under Section III.J.1.b and c.*  For Reportable Events under Section III.J.1.b and III.J.1.c, the report to OIG shall include:

        a.      a complete description of the Reportable Event, including the relevant facts, persons involved, and legal and Federal health care program authorities implicated;

        b.      a description of PHC's actions taken to correct the Reportable Event;

        c.      any further steps PHC plans to take to address the Reportable Event and prevent it from recurring; and

        d.      if the Reportable Event has resulted in an Overpayment, a description of the steps taken by PHC to identify and quantify the Overpayment.

5.    *Reportable Events under Section III.J.1.d.*  For Reportable Events under Section III.J.1.d, the report to the OIG shall include documentation of the bankruptcy filing and a description of any Federal health care program authorities implicated.

6.    *Reportable Events Involving the Stark Law.*  Notwithstanding the reporting requirements outlined above, any Reportable Event that involves only a probable violation of section 1877 of the Social Security Act, 42 U.S.C. §1395nn (the Stark Law) should be submitted by PHC to the Centers for Medicare & Medicaid Services (CMS) through the self-referral disclosure protocol (SRDP), with a copy to the OIG. The requirements of Section III.I.2 that require repayment to the payor of any identified Overpayment within 30 days shall not apply to any Overpayment that may result from a probable violation of only the Stark Law that is disclosed to CMS pursuant to the SRDP.

IV.    CHANGES TO BUSINESS UNITS OR LOCATIONS

    A.    Change or Closure of Unit or Location

In the event that, after the Effective Date, PHC changes locations or closes a business unit or location related to the furnishing of items or services that may be reimbursed by Federal health care programs, PHC shall notify OIG of this fact as soon as possible, but no later than within 30 days after the date of change or closure of the location.

    B.    Purchase or Establishment of New Unit or Location

In the event that, after the Effective Date, PHC purchases or establishes a new business unit or location related to the furnishing of items or services that may be reimbursed by Federal health care programs, PHC shall notify OIG at least 30 days prior to such purchase or the operation of the new business unit or location. This notification shall include the address of the new business unit or location, phone number, fax number, the location's Medicare and state Medicaid program provider number and/or supplier number(s), and the name and address of each Medicare and state Medicaid program contractor to which PHC currently submits claims. Each new business unit or location and all Covered Persons at each new business unit or location shall be subject to the applicable requirements of this CIA.

    C.    Sale of Unit or Location

In the event that, after the Effective Date, PHC proposes to sell any or all of its business units or locations that are subject to this CIA, PHC shall notify OIG of the proposed sale at least 30 days prior to the sale of such business unit or location. This notification shall include a description of the business unit or location to be sold, a brief description of the terms of the sale, and the name and contact information of the prospective purchaser. This CIA shall be binding on the purchaser of such business unit or location, unless otherwise determined and agreed to in writing by the OIG.

V.    IMPLEMENTATION AND ANNUAL REPORTS

    A.    Implementation Report

Within 120 days after the Effective Date, PHC shall submit a written report to OIG summarizing the status of its implementation of the requirements of this CIA (Implementation Report). The Implementation Report shall, at a minimum, include:

      1.    the name, address, phone number, and position description of the Compliance Officer required by Section III.A, and a summary of other noncompliance job responsibilities the Compliance Officer may have;

      2.    the names and positions of the members of the Compliance Committee required by Section III.A;

      3.    a copy of PHC's Code of Conduct required by Section III.B.1;

      4.    the number of individuals required to complete the Code of Conduct certification required by Section III.B.1, the percentage of individuals who have completed such certification, and an explanation of any exceptions (the documentation supporting this information shall be made available to OIG upon request);

      5.    a summary of all Policies and Procedures required by Section III.B (copies of the Policies and Procedures shall be made available to OIG upon request);

      6.    the following information regarding each type of training required by Section III.C:

          a.    a description of such training, including a summary of the topics covered, the length of sessions, and a schedule of training sessions;

          b.    the number of individuals required to be trained, percentage of individuals actually trained, and an explanation of any exceptions; and

          c.    with respect to active medical staff members, the number and percentage who completed the training, the type of training and the date received, and a description of PHC's efforts to encourage medical staff members to complete the training.

7.      a description of (a) the Focus Arrangements Tracking System required by Section III.D.1.a, (b) the internal review and approval process required by Section III.D.1.e; and (c) the tracking and monitoring procedures and other Focus Arrangements Procedures required by Section III.D.1;

8.      a description of the Disclosure Program required by Section III.F;

9.      the following information regarding the IRO(s): (a) identity, address, and phone number; (b) a copy of the engagement letter; (c) information to demonstrate that the IRO has the qualifications outlined in Appendix A to this CIA, (d) a summary and description of any and all current and prior engagements and agreements between PHC and the IRO; and (e) a certification from the IRO regarding its professional independence and objectivity with respect to PHC;

10.      a description of the process by which PHC fulfills the requirements of Section III.G regarding Ineligible Persons;

11.      a list of all of PHC's locations (including locations and mailing addresses); the corresponding name under which each location is doing business; the corresponding phone numbers and fax numbers; each location's Medicare and state Medicaid program provider number(s) and/or supplier number(s); and the name and address of each Medicare and state Medicaid program contractor to which PHC currently submits claims;

12.      a description of PHC's corporate structure, including identification of any parent and sister companies, subsidiaries, and their respective lines of business; and

13.      the certifications required by Section V.C.

B.      Annual Reports

PHC shall submit to OIG annually a report with respect to the status of, and findings regarding, PHC's compliance activities for each of the five Reporting Periods (Annual Report). Each Annual Report shall include, at a minimum:

1.      any change in the identity, position description, or other noncompliance job responsibilities of the Compliance Officer and any change in the membership of the Compliance Committee described in Section III.A;

2.      the Board resolution required by Section III.A.3;

3.      a summary of any changes or amendments to PHC's Code of Conduct required by Section III.B.1 and the reason for such changes, along with a copy of the revised Code of Conduct;

4.      the number of individuals required to complete the Code of Conduct certification required by Section III.B.1, the percentage of individuals who have completed such certification, and an explanation of any exceptions (the documentation supporting this information shall be made available to OIG upon request);

5.      a summary of any significant changes or amendments to the Policies and Procedures required by Section III.B and the reasons for such changes (e.g., change in contractor policy);

6.      the following information regarding each type of training required by Section III.C:

      a.      a description of the initial and annual training, including a summary of the topics covered, the length of sessions, and a schedule of training sessions;

      b.      the number of individuals required to complete the initial and annual training, the percentage of individuals who actually completed the initial and annual training, and an explanation of any exceptions; and

      c.      with respect to active medical staff members, the number and percentage who completed the training, the type of training and the date received, and a description of PHC's efforts to encourage medical staff members to complete the training.

7.      a description of (a) any changes to the Focus Arrangements Tracking System required by Section III.D.1.a; (b) any changes to the internal review and approval process required by Section III.D.1.e; and (c) any changes to the tracking and monitoring procedures and other Arrangements Procedures required by Section III.D.1;

8. a complete copy of all reports prepared pursuant to Section III.E, along with a copy of the IRO's engagement letter;

9. PHC's response to the reports prepared pursuant to Section III.E., along with corrective action plan(s) related to any issues raised by the reports;

10. a summary and description of any and all current and prior engagements and agreements between PHC and the IRO, if different from what was submitted as part of the Implementation Report;

11. a certification from the IRO regarding its professional independence and objectivity with respect to PHC;

12. a summary of Reportable Events (as defined in Section III.J) identified during the Reporting Period and the status of any corrective action relating to all such Reportable Events;

13. a report of the aggregate Overpayments that have been returned to the Federal health care programs. Overpayment amounts shall be broken down into the following categories: inpatient Medicare, outpatient Medicare, Medicaid (report each applicable state separately, if applicable), and other Federal health care programs. Overpayment amounts that are routinely reconciled or adjusted pursuant to policies and procedures established by the payor do not need to be included in this aggregate Overpayment report;

14. a summary of the disclosures in the disclosure log required by Section III.F that: (a) relate to Federal health care programs; or (b) involve allegations of conduct that may involve illegal remunerations or inappropriate referrals in violation of the Anti-Kickback Statute or Stark law (the complete disclosure log shall be made available to OIG upon request);

15. any changes to the process by which PHC fulfills the requirements of Section III.G regarding Ineligible Persons;

16. a summary describing any ongoing investigation or legal proceeding required to have been reported pursuant to Section III.H. The summary shall include a description of the allegation, the identity of the investigating or prosecuting agency, and the status of such investigation or legal proceeding;

17.    a description of all changes to the most recently provided list of PHC's locations (including addresses) as required by Section V.A.11; the corresponding name under which each location is doing business; the corresponding phone numbers and fax numbers; each location's Medicare and state Medicaid program provider number(s) and/or supplier number(s); and the name and address of each Medicare and state Medicaid program contractor to which PHC currently submits claims; and

18.    the certifications required by Section V.C.

The first Annual Report shall be received by OIG no later than 60 days after the end of the first Reporting Period.  Subsequent Annual Reports shall be received by OIG no later than the anniversary date of the due date of the first Annual Report.

C.    <u>Certifications</u>

The Implementation Report and Annual Reports shall include a certification by the Compliance Officer that:

1.    to the best of his or her knowledge, except as otherwise described in the applicable report, PHC is in compliance with all of the requirements of this CIA;

2.    to the best of his or her knowledge, PHC has implemented procedures reasonably designed to ensure that all Focus Arrangements do not violate the Anti-Kickback Statute and Stark Law, including the Focus Arrangements Procedures required in Section III.D of the CIA;

3.    to the best of his or her knowledge, PHC has fulfilled the requirements for New and Renewed Focus Arrangements under Section III.D.2 of the CIA;

4.    he or she has reviewed the Report and has made reasonable inquiry regarding its content and believes that the information in the Report is accurate and truthful; and

5.    to the best of his or her knowledge, PHC has complied with its obligations under the Settlement Agreement:  (a) not to resubmit to any Federal health care program payors any previously denied claims related to the Covered Conduct addressed in the Settlement Agreement, and not to appeal any such denials of claims; (b) not to charge to or otherwise seek payment from federal or state payors for unallowable

26

costs (as defined in the Settlement Agreement); and (c) to identify and adjust any past charges or claims for unallowable costs;

    D.    <u>Designation of Information</u>

PHC shall clearly identify any portions of its submissions that it believes are trade secrets, or information that is commercial or financial and privileged or confidential, and therefore potentially exempt from disclosure under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. PHC shall refrain from identifying any information as exempt from disclosure if that information does not meet the criteria for exemption from disclosure under FOIA.

**VI.**    <u>NOTIFICATIONS AND SUBMISSION OF REPORTS</u>

Unless otherwise stated in writing after the Effective Date, all notifications and reports required under this CIA shall be submitted to the following entities:

<u>OIG</u>:    Administrative and Civil Remedies Branch
Office of Counsel to the Inspector General
Office of Inspector General
U.S. Department of Health and Human Services
Cohen Building, Room 5527
330 Independence Avenue, S.W.
Washington, DC 20201
Telephone: 202.619.2078
Facsimile: 202.205.0604

<u>PHC</u>:    Sharon Alcraz
Chief Compliance Officer
[Address]
[Phone]
[Facsimile]
[E-Mail]

Unless otherwise specified, all notifications and reports required by this CIA may be made by certified mail, overnight mail, hand delivery, or other means, provided that there is proof that such notification was received. For purposes of this requirement, internal facsimile confirmation sheets do not constitute proof of receipt. Upon request by OIG, PHC may be required to provide OIG with an electronic copy of each notification or report required by this CIA in searchable portable document format (pdf), in addition to a paper copy.

## VII.   OIG INSPECTION, AUDIT, AND REVIEW RIGHTS

In addition to any other rights OIG may have by statute, regulation, or contract, OIG or its duly authorized representative(s) may examine or request copies of PHC's books, records, and other documents and supporting materials and/or conduct on-site reviews of any of PHC's locations for the purpose of verifying and evaluating: (a) PHC's compliance with the terms of this CIA; and (b) PHC's compliance with the requirements of the Federal health care programs in which it participates. The documentation described above shall be made available by PHC to OIG or its duly authorized representative(s) at all reasonable times for inspection, audit, or reproduction. Furthermore, for purposes of this provision, OIG or its duly authorized representative(s) may interview any of PHC's employees, contractors, or agents who consent to be interviewed at the individual's place of business during normal business hours or at such other place and time as may be mutually agreed upon between the individual and OIG. PHC shall assist OIG or its duly authorized representative(s) in contacting and arranging interviews with such individuals upon OIG's request. PHC's employees may elect to be interviewed with or without a representative of PHC present.

## VIII.   DOCUMENT AND RECORD RETENTION

PHC shall maintain for inspection all documents and records relating to reimbursement from the Federal health care programs, or to compliance with this CIA, for six (6) years (or longer if otherwise required by law) from the Effective Date.

28

**IX.**   <u>DISCLOSURES</u>

Consistent with HHS's FOIA procedures, set forth in 45 C.F.R. Part 5, OIG shall make a reasonable effort to notify PHC prior to any release by OIG of information submitted by PHC pursuant to its obligations under this CIA and identified upon submission by PHC as trade secrets, or information that is commercial or financial and privileged or confidential, under the FOIA rules.  With respect to such releases, PHC shall have the rights set forth at 45 C.F.R. § 5.65(d).

**X.**   <u>BREACH AND DEFAULT PROVISIONS</u>

PHC is expected to fully and timely comply with all of its CIA obligations.

**A.**   <u>Stipulated Penalties for Failure to Comply with Certain Obligations</u>

As a contractual remedy, PHC and OIG hereby agree that failure to comply with certain obligations as set forth in this CIA may lead to the imposition of the following monetary penalties (hereinafter referred to as "Stipulated Penalties") in accordance with the following provisions.

1.   A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day PHC fails to establish and implement any of the following obligations as described in Section III:

   a.   a Compliance Officer;

   b.   a Compliance Committee;

   c.   the Board of Directors compliance obligations;

   d.   a written Code of Conduct;

   e.   written Policies and Procedures;

   f.   the training of Covered Persons, Arrangements Covered Persons, and Board Members;

g.    the Focus Arrangements Procedures and/or Focus
Arrangements Requirements described in Sections III.D.1 and
III.D.2;

h.    a Disclosure Program;

i.    Ineligible Persons screening and removal requirements;

j.    notification of Government investigations or legal
proceedings; and

k.    reporting of Reportable Events.

2.    A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day PHC fails to engage and use an IRO, as required in Section III.E, Appendix A, and Appendix B.

3.    A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day PHC fails to submit the Implementation Report or any Annual Reports to OIG in accordance with the requirements of Section V by the deadlines for submission.

4.    A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day PHC fails to submit the annual Arrangements Review Report or Unallowable Cost Review Report in accordance with the requirements of Section III.E and Appendix B.

5.    A Stipulated Penalty of $1,500 for each day PHC fails to grant access as required in Section VII. (This Stipulated Penalty shall begin to accrue on the date PHC fails to grant access.)

6.    A Stipulated Penalty of $5,000 for each false certification submitted by or on behalf of PHC as part of its Implementation Report, Annual Report, additional documentation to a report (as requested by the OIG), or otherwise required by this CIA.

7.    A Stipulated Penalty of $1,000 for each day PHC fails to comply fully and adequately with any obligation of this CIA.  OIG shall provide notice to PHC stating the specific grounds for its determination that PHC has failed to comply fully and adequately with the CIA obligation(s) at issue and steps PHC shall take to comply with the CIA.  (This Stipulated Penalty shall begin to accrue 10 days after PHC receives this notice from OIG of the failure to comply.)  A Stipulated Penalty as described in this Subsection shall not be demanded for any violation for which OIG has sought a Stipulated Penalty under Subsections 1-6 of this Section.

B.    Timely Written Requests for Extensions

PHC may, in advance of the due date, submit a timely written request for an extension of time to perform any act or file any notification or report required by this CIA.  Notwithstanding any other provision in this Section, if OIG grants the timely written request with respect to an act, notification, or report, Stipulated Penalties for failure to perform the act or file the notification or report shall not begin to accrue until one day after PHC fails to meet the revised deadline set by OIG.  Notwithstanding any other provision in this Section, if OIG denies such a timely written request, Stipulated Penalties for failure to perform the act or file the notification or report shall not begin to accrue until three business days after PHC receives OIG's written denial of such request or the original due date, whichever is later.  A "timely written request" is defined as a request in writing received by OIG at least five business days prior to the date by which any act is due to be performed or any notification or report is due to be filed.

C.    Payment of Stipulated Penalties

1.    *Demand Letter*.  Upon a finding that PHC has failed to comply with any of the obligations described in Section X.A and after determining that Stipulated Penalties are appropriate, OIG shall notify PHC of:  (a) PHC's failure to comply; and (b) OIG's exercise of its contractual right to demand payment of the Stipulated Penalties. (This notification shall be referred to as the "Demand Letter.")

2.    *Response to Demand Letter*.  Within 10 days after the receipt of the Demand Letter, PHC shall either:  (a) cure the breach to OIG's satisfaction and pay the applicable Stipulated Penalties or (b) request a hearing before an HHS administrative law judge (ALJ) to dispute OIG's determination of noncompliance, pursuant to the agreed upon provisions set forth below in Section X.E.  In the event PHC elects to request an ALJ hearing, the Stipulated Penalties shall continue to accrue until PHC cures, to OIG's satisfaction, the alleged breach in dispute.  Failure to respond to the Demand Letter in

31

one of these two manners within the allowed time period shall be considered a material breach of this CIA and shall be grounds for exclusion under Section X.D.

   3. *Form of Payment*.  Payment of the Stipulated Penalties shall be made by electronic funds transfer to an account specified by OIG in the Demand Letter.

   4. *Independence from Material Breach Determination*.  Except as set forth in Section X.D.1.c, these provisions for payment of Stipulated Penalties shall not affect or otherwise set a standard for OIG's decision that PHC has materially breached this CIA, which decision shall be made at OIG's discretion and shall be governed by the provisions in Section X.D, below.

  D. <u>Exclusion for Material Breach of this CIA</u>

   1. *Definition of Material Breach*.  A material breach of this CIA means:

    a. a failure by PHC to report a Reportable Event, take corrective action, and make the appropriate refunds, as required in Section III.J;

    b. a repeated or flagrant violation of the obligations under this CIA, including, but not limited to, the obligations addressed in Section X.A;

    c. a failure to respond to a Demand Letter concerning the payment of Stipulated Penalties in accordance with Section X.C; or

    d. a failure to engage and use an IRO in accordance with Section III.E, Appendix A, and Appendix B.

   2. *Notice of Material Breach and Intent to Exclude*.  The parties agree that a material breach of this CIA by PHC constitutes an independent basis for PHC's exclusion from participation in the Federal health care programs.  Upon a determination by OIG that PHC has materially breached this CIA and that exclusion is the appropriate remedy, OIG shall notify PHC of:  (a) PHC's material breach; and (b) OIG's intent to exercise its contractual right to impose exclusion.  (This notification shall be referred to as the "Notice of Material Breach and Intent to Exclude.")

3.    *Opportunity to Cure*.  PHC shall have 30 days from the date of
receipt of the Notice of Material Breach and Intent to Exclude to demonstrate to OIG's
satisfaction that:

a.    PHC is in compliance with the obligations of the CIA cited by
OIG as being the basis for the material breach;

b.    the alleged material breach has been cured; or

c.    the alleged material breach cannot be cured within the 30-day
period, but that: (i) PHC has begun to take action to cure the
material breach; (ii) PHC is pursuing such action with due
diligence; and (iii) PHC has provided to OIG a reasonable
timetable for curing the material breach.

4.    *Exclusion Letter*.  If, at the conclusion of the 30-day period, PHC
fails to satisfy the requirements of Section X.D.3, OIG may exclude PHC from
participation in the Federal health care programs.  OIG shall notify PHC in writing of its
determination to exclude PHC.  (This letter shall be referred to as the "Exclusion Letter.")
Subject to the Dispute Resolution provisions in Section X.E, below, the exclusion shall
go into effect 30 days after the date of PHC's receipt of the Exclusion Letter.  The
exclusion shall have national effect and shall also apply to all other Federal procurement
and nonprocurement programs.  Reinstatement to program participation is not automatic.
After the end of the period of exclusion, PHC may apply for reinstatement by submitting
a written request for reinstatement in accordance with the provisions at 42 C.F.R.
§§ 1001.3001-.3004.

E.    Dispute Resolution

1.    *Review Rights*.  Upon OIG's delivery to PHC of its Demand Letter
or of its Exclusion Letter, and as an agreed-upon contractual remedy for the resolution of
disputes arising under this CIA, PHC shall be afforded certain review rights comparable
to the ones that are provided in 42 U.S.C. § 1320a-7(f) and 42 C.F.R. Part 1005 as if they
applied to the Stipulated Penalties or exclusion sought pursuant to this CIA.  Specifically,
OIG's determination to demand payment of Stipulated Penalties or to seek exclusion
shall be subject to review by an HHS ALJ and, in the event of an appeal, the HHS
Departmental Appeals Board (DAB), in a manner consistent with the provisions in 42
C.F.R. § 1005.2-1005.21.  Notwithstanding the language in 42 C.F.R. § 1005.2(c), the
request for a hearing involving Stipulated Penalties shall be made within 10 days after

33

receipt of the Demand Letter and the request for a hearing involving exclusion shall be
made within 25 days after receipt of the Exclusion Letter.

      2.    *Stipulated Penalties Review*.  Notwithstanding any provision of Title
42 of the United States Code or Title 42 of the Code of Federal Regulations, the only
issues in a proceeding for Stipulated Penalties under this CIA shall be:  (a) whether PHC
was in full and timely compliance with the obligations of this CIA for which OIG
demands payment; and (b) the period of noncompliance.  PHC shall have the burden of
proving its full and timely compliance and the steps taken to cure the noncompliance, if
any.  OIG shall not have the right to appeal to the DAB an adverse ALJ decision related
to Stipulated Penalties.  If the ALJ agrees with OIG with regard to a finding of a breach
of this CIA and orders PHC to pay Stipulated Penalties, such Stipulated Penalties shall
become due and payable 20 days after the ALJ issues such a decision unless PHC
requests review of the ALJ decision by the DAB.  If the ALJ decision is properly
appealed to the DAB and the DAB upholds the determination of OIG, the Stipulated
Penalties shall become due and payable 20 days after the DAB issues its decision.

      3.    *Exclusion Review*.  Notwithstanding any provision of Title 42 of the
United States Code or Title 42 of the Code of Federal Regulations, the only issues in a
proceeding for exclusion based on a material breach of this CIA shall be:

      a.    whether PHC was in material breach of this CIA;

      b.    whether such breach was continuing on the date of the
Exclusion Letter; and

      c.    whether the alleged material breach could not have been
cured within the 30-day period, but that: (i) PHC had begun
to take action to cure the material breach within that period;
(ii) PHC has pursued and is pursuing such action with due
diligence; and (iii) PHC provided to OIG within that period a
reasonable timetable for curing the material breach and PHC
has followed the timetable.

For purposes of the exclusion herein, exclusion shall take effect only after an ALJ decision favorable to OIG, or, if the ALJ rules for PHC, only after a DAB decision in favor of OIG. PHC's election of its contractual right to appeal to the DAB shall not abrogate OIG's authority to exclude PHC upon the issuance of an ALJ's decision in favor of OIG. If the ALJ sustains the determination of OIG and determines that exclusion is authorized, such exclusion shall take effect 20 days after the ALJ issues such a decision, notwithstanding that PHC may request review of the ALJ decision by the DAB. If the DAB finds in favor of OIG after an ALJ decision adverse to OIG, the exclusion shall take effect 20 days after the DAB decision. PHC shall waive its right to any notice of such an exclusion if a decision upholding the exclusion is rendered by the ALJ or DAB. If the DAB finds in favor of PHC, PHC shall be reinstated effective on the date of the original exclusion.

4. *Finality of Decision.* The review by an ALJ or DAB provided for above shall not be considered to be an appeal right arising under any statutes or regulations. Consequently, the parties to this CIA agree that the DAB's decision (or the ALJ's decision if not appealed) shall be considered final for all purposes under this CIA.

## XI. EFFECTIVE AND BINDING AGREEMENT

PHC and OIG agree as follows:

A. This CIA shall be binding on the successors, assigns, and transferees of PHC;

B. This CIA shall become final and binding on the date the final signature is obtained on the CIA;

C. This CIA constitutes the complete agreement between the parties and may not be amended except by written consent of the parties to this CIA;

D. OIG may agree to a suspension of PHC's obligations under this CIA based on a certification by PHC that it is no longer providing health care items or services that will be billed to any Federal health care program and that it does not have any ownership or control interest, as defined in 42 U.S.C. §1320a-3, in any entity that bills any Federal health care program. If PHC is relieved of its CIA obligations, PHC will be required to notify OIG in writing at least 30 days in advance if PHC plans to resume providing health care items or services that are billed to any Federal health care program or to obtain an

35

ownership or control interest in any entity that bills any Federal health care program.  At
such time, OIG shall evaluate whether the CIA will be reactivated or modified.

      E.     The undersigned PHC signatories represent and warrant that they are
authorized to execute this CIA.  The undersigned OIG signatory represents that he is
signing this CIA in his official capacity and that he is authorized to execute this CIA.

      F.     This CIA may be executed in counterparts, each of which constitutes an
original and all of which constitute one and the same CIA.  Facsimiles of signatures shall
constitute acceptable, binding signatures for purposes of this CIA.

ON BEHALF OF PHC

_____          _____
                                          DATE

_____          _____
                                          DATE

_____          _____
                                          DATE

ON BEHALF OF THE OFFICE OF INSPECTOR GENERAL
OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES


_____                    _____
GREGORY E. DEMSKE                               DATE
Assistant Inspector General for Legal Affairs
Office of Inspector General
U. S. Department of Health and Human Services


_____                    _____
GREGORY J. WELLINS                              DATE
Senior Counsel
Office of Inspector General
U. S. Department of Health and Human Services

APPENDIX A

INDEPENDENT REVIEW ORGANIZATION

This Appendix contains the requirements relating to the Independent Review
Organization (IRO) required by Section III.E of the CIA.

    A.    IRO Engagement

        1.    PHC shall engage an IRO that possesses the qualifications set forth
in Paragraph B, below, to perform the responsibilities in Paragraph C, below. The IRO
shall conduct the review in a professionally independent and objective fashion, as set
forth in Paragraph D. Within 30 days after OIG receives the information identified in
Section V.A.9 of the CIA or any additional information submitted by PHC in response to
a request by OIG, whichever is later, OIG will notify PHC if the IRO is unacceptable.
Absent notification from OIG that the IRO is unacceptable, PHC may continue to engage
the IRO.

        2.    If PHC engages a new IRO during the term of the CIA, this IRO
shall also meet the requirements of this Appendix. If a new IRO is engaged, PHC shall
submit the information identified in Section V.A.9 of the CIA to OIG within 30 days of
engagement of the IRO. Within 30 days after OIG receives this information or any
additional information submitted by PHC at the request of OIG, whichever is later, OIG
will notify PHC if the IRO is unacceptable. Absent notification from OIG that the IRO is
unacceptable, PHC may continue to engage the IRO.

    B.    IRO Qualifications

The IRO shall:

        1.    assign individuals to conduct the Arrangements Review who are
knowledgeable in the requirements of the Anti-Kickback Statute and the Stark Law and
the regulations and other guidance documents related to these statutes; and

        2.    have sufficient staff and resources to conduct the reviews required
by the CIA on a timely basis.

    C.    IRO Responsibilities

The IRO shall:

        1.    perform each Arrangements Review in accordance with the specific
requirements of the CIA;

1

      2.      respond to all OIG inquires in a prompt, objective, and factual manner; and

      3.      prepare timely, clear, well-written reports that include all the information required by Appendix B to the CIA.

D.     <u>IRO Independence and Objectivity</u>

The IRO must perform the Arrangements Review in a professionally independent and objective fashion, as appropriate to the nature of the engagement, taking into account any other business relationships or engagements that may exist between the IRO and PHC.

E.     <u>IRO Removal/Termination</u>

      1.     *Provider and IRO.* If PHC terminates its IRO or if the IRO withdraws from the engagement during the term of the CIA, PHC must submit a notice explaining its reasons for termination or the reason for withdrawal to OIG no later than 30 days after termination or withdrawal. PHC must engage a new IRO in accordance with Paragraph A of this Appendix and within 60 days of termination or withdrawal of the prior IRO or at least 60 days prior to the end of the current Reporting Period, whichever is earlier.

      2.     *OIG Removal of IRO.* In the event OIG has reason to believe that the IRO does not possess the qualifications described in Paragraph B, is not independent and objective as set forth in Paragraph D, or has failed to carry out its responsibilities as described in Paragraph C, OIG may, at its sole discretion, require PHC to engage a new IRO in accordance with Paragraph A of this Appendix. PHC must engage a new IRO within 60 days of termination of the prior IRO or at least 60 days prior to the end of the current Reporting Period, whichever is earlier.

Prior to requiring PHC to engage a new IRO, OIG shall notify PHC of its intent to do so and provide a written explanation of why OIG believes such a step is necessary. To resolve any concerns raised by OIG, PHC may present additional information regarding the IRO's qualifications, independence or performance of its responsibilities. OIG will attempt in good faith to resolve any differences regarding the IRO with PHC prior to requiring PHC to terminate the IRO. However, the final determination as to whether or not to require PHC to engage a new IRO shall be made at the sole discretion of OIG.

APPENDIX B

ARRANGEMENTS REVIEW

The Arrangements Review shall consist of two components: a systems review and a transactions review. The IRO shall perform all components of each Arrangements Review. If there are no material changes to PHC's systems, processes, policies, and procedures relating to Arrangements, the Arrangements Systems Review shall be performed for the first and fourth Reporting Periods. If PHC materially changes the Arrangements systems, processes, policies and procedures, the IRO shall perform an Arrangements Systems Review for the Reporting Period in which such changes were made in addition to conducting the systems review for the first and fourth Reporting Periods. The Arrangements Transactions Review shall be performed annually and shall cover each of the five Reporting Periods.

     A.    <u>Arrangements Systems Review</u>. The Arrangements Systems Review shall be a review of PHC's systems, processes, policies, and procedures relating to the initiation, review, approval, and tracking of Arrangements. Specifically, the IRO shall review the following:

         1.    PHC's systems, policies, processes, and procedures with respect to creating and maintaining a centralized tracking system for all existing and new and renewed Focus Arrangements (Focus Arrangements Tracking System), including a detailed description of the information captured in the Focus Arrangements Tracking System;

         2.    PHC's systems, policies, processes, and procedures for tracking remuneration to and from all parties to Focus Arrangements;

         3.    PHC's systems, policies, processes, and procedures for tracking service and activity logs to ensure that parties to the Focus Arrangement are performing the services required under the applicable Focus Arrangement(s) (if applicable);

         4.    PHC's systems, policies, processes, and procedures for monitoring the use of leased space, medical supplies, medical devices, equipment, or other patient care items to ensure that such use is consistent with the terms of the applicable Focus Arrangement(s) (if applicable);

         5.    PHC's systems, policies, processes, and procedures for initiating Arrangements, including those policies that identify the individuals with

authority to initiate an Arrangement and that specify the business need or business rationale required to initiate an Arrangement;

6.    PHC's systems, policies, processes, and procedures for the internal review and approval of all Arrangements, including those policies that identify the individuals required to approve each type or category of Arrangement entered into by PHC, the internal controls designed to ensure that all required approvals are obtained, and the processes for ensuring that all Focus Arrangements are subject to a legal review by counsel with expertise in the Anti-Kickback Statute and Stark Law;

7.    the Compliance Officer's annual review of and reporting to the Compliance Committee on the Focus Arrangements Tracking System, PHC's internal review and approval process, and other Arrangements systems, process, policies, and procedures;

8.    PHC's systems, policies, processes, and procedures for implementing effective responses when suspected violations of the Anti-Kickback Statute and Stark Law are discovered, including disclosing Reportable Events and quantifying and repaying Overpayments when appropriate; and

9.    PHC's systems, policies, processes, and procedures for ensuring that all new and renewed Focus Arrangements comply with the Focus Arrangements Requirements set forth in Section III.D.2 of the CIA.

B.    Arrangements Systems Review Report.  The IRO shall prepare a report based upon each Arrangements Systems Review performed.  The Arrangements Systems Review Report shall include the following information:

1.    a description of the documentation (including policies) reviewed and personnel interviewed;

2.    a detailed description of PHC's systems, policies, processes, and procedures relating to the items identified in Section A.1-9 above;

3.    findings and supporting rationale regarding weaknesses in PHC's systems, processes, policies, and procedures relating to Arrangements described in Section A.1-9 above; and

4.    recommendations to improve PHC's systems, policies, processes, or procedures relating to Arrangements described in Section A.1-9 above.

C.     Arrangements Transactions Review.  The Arrangements Transactions Review shall consist of a review by the IRO of 50 randomly selected Focus Arrangements that were entered into or renewed by PHC during the Reporting Period.  The IRO shall assess whether PHC has complied with the Focus Arrangements Procedures and the Focus Arrangements Requirements described in Sections III.D.1 and III.D.2 of the CIA, with respect to the selected Focus Arrangements.

The IRO's assessment with respect to each Focus Arrangement that is subject to review shall include:

1.     verifying that the Focus Arrangement is maintained in PHC's centralized tracking system in a manner that permits the IRO to identify the parties to the Focus Arrangement and the relevant terms of the Focus Arrangement (i.e., the items/services/equipment/space to be provided, the amount of compensation, the effective date, the expiration date, etc.)

2.     verifying that the Focus Arrangement was subject to the internal review and approval process (including both a legal and business review) and obtained the necessary approvals and that such review and approval is appropriately documented;

3.     verifying that the remuneration related to the Focus Arrangement is properly tracked;

4.     verifying that the service and activity logs are properly completed and reviewed (if applicable);

5.     verifying that leased space, medical supplies, medical devices, and equipment, and other patient care items are properly monitored (if applicable); and

6.     verifying that the Focus Arrangement satisfies the Focus Arrangements Requirements of Section III.D.2 of the CIA.

D.     Arrangements Transaction Review Report.  The IRO shall prepare a report based on each Arrangements Transactions Review performed.  The Arrangements Transaction Review Report shall include the following information:

1.     *Review Methodology*

a.     Review Protocol:  A detailed narrative description of the procedures performed and a description of the

3

sampling unit and universe utilized in performing the
procedures for the sample reviewed.

b.    Sources of Data:  A full description of the
documentation and other information, if applicable,
relied upon by the IRO in performing the
Arrangements Transaction Review.

c.    Supplemental Materials.  The IRO shall request all
documentation and materials required for its review of
the Focus Arrangements selected as part of the
Arrangements Transaction Review and PHC shall
furnish such documentation and materials to the IRO,
prior to the IRO initiating its review of the Focus
Arrangements.  If the IRO accepts any supplemental
documentation or materials from PHC after the IRO
has completed its initial review of the Focus
Arrangements (Supplemental Materials), the IRO shall
identify in the Arrangements Transaction Review
Report the Supplemental Materials, the date the
Supplemental Materials were accepted, and the relative
weight the IRO gave to the Supplemental Materials in
its review.  In addition, the IRO shall include a
narrative in the Arrangements Transaction Review
Report describing the process by which the
Supplemental Materials were accepted and the IRO's
reasons for accepting the Supplemental Materials.

2.    *Review Findings*.  The IRO's findings with respect to whether
PHC has complied with the Focus Arrangements Procedures and Focus
Arrangements Requirements with respect to each of the randomly selected Focus
Arrangements reviewed by the IRO.  In addition, the Arrangements Transactions
Review Report shall include observations, findings and recommendations on
possible improvements to PHC's policies, procedures, and systems in place to
ensure that all Focus Arrangements comply with the Focus Arrangements
Procedures and Focus Arrangements Requirements.

```
 1  ANDRÉ BIROTTE JR.
    United States Attorney
 2  ROBERT E. DUGDALE
    Assistant United States Attorney
 3  Chief, Criminal Division
    CONSUELO S. WOODHEAD (SBN 69653)
 4  EVAN J. DAVIS (SBN 250484)
    Assistant United States Attorneys
 5  Major Frauds Section
       312 North Spring Street #1100
 6     Los Angeles, CA  90012
       Telephone: (213) 894-3987/4850
 7     Facsimile: (213) 894-6269
       Email: consuelo.woodhead@usdoj.gov
 8            Evan.Davis@usdoj.gov

 9  Attorneys for Plaintiff
    United States
10
```

```
11                  UNITED STATES DISTRICT COURT

12                 CENTRAL DISTRICT OF CALIFORNIA

13                       WESTERN DIVISION
```

| | | |
|---|---|---|
| 14 | UNITED STATES OF AMERICA | ) No. CV |
| | | ) |
| 15 |         Plaintiff, | ) STIPULATION FOR ENTRY OF |
| | | ) JUDGMENT |
| 16 |     v. | ) |
| | | ) [No hearing required] |
| 17 | PACIFIC HEALTH CORPORATION, A | ) |
| | GEORGIA CORPORATION; LOS | ) |
| 18 | ANGELES DOCTORS HOSPITAL | ) |
| | CORPORATION, dba Los Angeles | ) |
| 19 | Metropolitan Medical Center; | ) |
| | TUSTIN HOSPITAL AND MEDICAL | ) |
| 20 | CENTER, A CALIFORNIA | ) |
| | CORPORATION, dba Newport | ) |
| 21 | Specialty Hospital; AESCULAP | ) |
| | HOSPITAL CORPORATION; AMISUB | ) |
| 22 | INC.; and ANAHEIM GENERAL | ) |
| | HOSPITAL CORPORATION AND | ) |
| 23 | ANAHEIM GENERAL HOSPITAL, LTD, | ) |
| | A CALIFORNIA LIMITED | ) |
| 24 | PARTNERSHIP, | ) |
| | | ) |
| 25 |         Defendants. | ) |
| | | ) |
| 26 | | ) |
| | | ) |
| 27 | | ) |
| 28 | | |

EXHIBIT A-4

1     Plaintiff United States of America ("government"), and
2  defendants Pacific Health Corporation ("PHC"), and its associated
3  entities and subsidiaries, Los Angeles Doctors Hospital
4  Corporation, doing business as Los Angeles Metropolitan Medical
5  Center ("LAMMC"), Tustin Hospital and Medical Center, a
6  California corporation, doing business as Newport Specialty
7  Hospital (formerly doing business as Tustin Hospital and Medical
8  Center) (collectively "THMC"), and Aesculap Hospital Corporation,
9  AMISUB Inc., Anaheim General Hospital Corporation and Anaheim
10 General Hospital, Ltd, a California limited partnership, doing
11 business as Anaheim General Hospital ("Anaheim") (collectively
12 "defendants"), through the undersigned agents and by their
13 undersigned counsel of record, hereby stipulate as follows:
14     1.    Pursuant to agreement of the parties dated April 27,
15 2012, the defendants agreed to be jointly and severally liable
16 for the criminal restitution amount imposed on Los Angeles
17 Doctors Hospital, Inc. ("LADH"), a subsidiary of PHC, pursuant to
18 a judgment and commitment order following the entry of a guilty
19 plea by LADH to a conspiracy to pay kickbacks to increase patient
20 census in hospitals owned and operated by defendants.
21     2.    Under the terms of that agreement, which is attached as
22 Exhibit 1 and incorporated by reference herein, the parties
23 agreed that if LADH failed to fully comply with its restitution
24 obligations the government was authorized to file this
25 stipulation and the related judgment lodged herewith.  Doing so
26 would, inter alia, permit the collection of unpaid restitution
27 amounts for which the defendants agreed to be jointly and
28 severally liable.

2

1      3.    By the filing of this stipulation, the government

2  represents that LADH has failed to fully comply with its

3  restitution obligation.

4      4.    The parties agree that the Court need not enter factual

5  findings or legal conclusions in order to enter the judgment

6  lodged herewith, as this judgment is supported by Exhibit 1.

7      5.    Upon entry of the judgment, the government may take any

8  collection action authorized by law to collect the unpaid portion

9  of the judgment.

10                              Respectfully submitted,

11                              ANDRÉ BIROTTE JR.
                                United States Attorney
12                              ROBERT E. DUGDALE
                                Assistant United States Attorney
13                              Chief, Criminal Division

14          August 20
15  Dated: April ___, 2012
                                EVAN J. DAVIS
16                              Assistant United States Attorney
                                312 North Spring Street
17                              Los Angeles, CA 90012
                                Telephone: (213) 894-6551

18                              Attorneys for Plaintiff
                                United States
19

20  DATED: April 27, 2012

21                    Name and Title: Michael O Chuo
22                    President & CEO  Pacific Health Corporation

23

24  DATED: April 27, 2012

25
                      Name and Title:
26       President & CEO    Aesculap Hospital Corporation

27

28  DATED: April 27, 2012

                                3

1
2                                     Name and Title: *Michael O. Choo*
                          *President & CEO*    Anaheim General Hospital
3    STIPULATION FOR ENTRY OF JUDGMENT          Corporation
4
5    DATED: April 27, 2012
6                                     Name and Title: *Michael O. Choo*
                          *President & CEO*    AMISUB Incorporated
7
8
9    DATED: April 27, 2012
10                                    Name and Title: *Michael O. Choo*
                          *President & CEO*    Anaheim General Partnership
11                                              Limited
12
13   DATED: April 27, 2012
14                                    Name and Title: *Michael O. Choo*
                          *President & CEO*    Los Angeles Doctors Hospital
15                                              Corporation
16
17   DATED: April 27, 2012
18                                    Name and Title: *Michael O. Choo*
                          *President & CEO*    Tustin Hospital and Medical
19                                              Center
20
21   DATED: April 27, 2012
22
                                      Name and Title: *Michael O. Choo*
23                        *President & CEO*    Tustin Surgicenter Limited
24
25
26   DATED: April 27, 2012
                                      DUANE R. LYONS
27                                    Quinn Emanuel Urquhart & Sullivan,
                                      LLP
28                                    Attorney for all defendants

                                      4

1 | ANDRÉ BIROTTE JR.
United States Attorney
2 | ROBERT E. DUGDALE
Assistant United States Attorney
3 | Chief, Criminal Division
CONSUELO S. WOODHEAD (SBN 69653)
4 | EVAN J. DAVIS (SBN 250484)
Assistant United States Attorneys
5 | Major Frauds Section
    312 North Spring Street #1100
6 |   Los Angeles, CA  90012
    Telephone: (213) 894-3987/4850
7 |   Facsimile: (213) 894-6269
    Email: consuelo.woodhead@usdoj.gov
8 |           Evan.Davis@usdoj.gov

9 | Attorneys for Plaintiff
United States

10 |

11 |                UNITED STATES DISTRICT COURT

12 |              CENTRAL DISTRICT OF CALIFORNIA

13 |                   WESTERN DIVISION

14 | UNITED STATES OF AMERICA        )  No. CV
                                    )
15 |            Plaintiff,          )  [PROPOSED]
                                    )  JUDGMENT
16 |       v.                       )
                                    )
17 | PACIFIC HEALTH CORPORATION, A   )
GEORGIA CORPORATION; LOS            )
18 | ANGELES DOCTORS HOSPITAL        )
CORPORATION, dba Los Angeles        )
19 | Metropolitan Medical Center;    )
TUSTIN HOSPITAL AND MEDICAL         )
20 | CENTER, A CALIFORNIA            )
CORPORATION, dba Newport            )
21 | Specialty Hospital; AESCULAP    )
HOSPITAL CORPORATION; AMISUB        )
22 | INC.; and ANAHEIM GENERAL       )
HOSPITAL CORPORATION AND            )
23 | ANAHEIM GENERAL HOSPITAL, LTD,  )
A CALIFORNIA LIMITED                )
24 | PARTNERSHIP,                    )
                                    )
25 |           Defendants.          )
                                    )
26 |                                 )
                                    )
27 | _____ )

28 |

EXHIBIT A-5

1

1       Pursuant to the stipulation of plaintiff United States of

2 America ("government"), and defendants Pacific Health Corporation

3 ("PHC"), and its associated entities and subsidiaries, Los

4 Angeles Doctors Corporation, doing business as Los Angeles

5 Metropolitan Medical Center ("LAMMC"), Tustin Hospital and

6 Medical Center, a California corporation, doing business as

7 Newport Specialty Hospital (formerly doing business as Tustin

8 Hospital and Medical Center) (collectively "THMC"), and Aesculap

9 Hospital Corporation, AMISUB Inc., Anaheim General Hospital

10 Corporation and Anaheim General Hospital, Ltd, a California

11 limited partnership, doing business as Anaheim General Hospital

12 ("Anaheim") (collectively "defendants"),, which stipulation and

13 attached exhibit are made part of the record, **IT IS ORDERED**:

14     1.  On or about April 27, 2012, the parties entered an

15 agreement, attached as Exhibit 1 to the stipulation, in which

16 defendants agreed to be jointly and severally liable with Los

17 Angeles Doctors Hospital, Inc. ("LADH"), for restitution to be

18 imposed on LADH as a result of LADH's guilty plea to a charge of

19 having conspired to pay kickbacks for the referral of patients.

20     2.  Pursuant to that agreement, if LADH failed to comply

21 with any of its restitution obligations then the government was

22 permitted to file and lodge the stipulation and proposed order.

23     3.  By filing the stipulation and lodging this order, the

24 government has represented that LADH failed to comply fully with

25 its restitution obligation.

26     4.  Judgment is hereby entered against the defendants for

27 $15,947,785, the full amount of restitution imposed pursuant to

28 the Judgment and Commitment Order against LADH, plus additional

1  interest imposed pursuant to the Order, less any payments made

2  after imposition of the Judgment and Commitment Order.

3      5.    This judgment applies to all property and rights to

4  property of the defendants.

5      6.    Each party hereto shall bear its own costs and

6  attorney's fees in connection with this case.

7      IT IS SO ORDERED.

8  _____

9                                  GEORGE H. KING
                                   United States District Judge

10  Submitted by and approved as to form and substance:

11  ANDRÉ BIROTTE JR.
    United States Attorney

12  ROBERT E. DUGDALE
    Assistant United States Attorney

13  Chief, Criminal Division

14

15  _____

    CONSUELO S. WOODHEAD

16  EVAN J. DAVIS
    Assistant United States Attorneys

17  312 North Spring Street
    Los Angeles, CA 90012

18  Telephone: (213) 894-3987/6551

19  Attorneys for Plaintiff
    United States

20

21

22

23  _____
    DUANE R. LYONS

24  Quinn Emanuel Urquhart & Sullivan,
    LLP

    Attorney for all defendants

25

26

27

28

                              3

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. _____ |
| Plaintiff, | I N F O R M A T I O N |
| vs. | [18 U.S.C. § 371: Conspiracy to Pay Kickbacks for Patient Referrals in Violation of 42 U.S.C. § 1320a-7b(b)(2)(A)] |
| LOS ANGELES DOCTORS HOSPITAL, INC., | |
| Defendant. | |

The United States Attorney charges:

COUNT ONE

[18 U.S.C. §§ 371 and 2(b)]

A.    INTRODUCTORY ALLEGATIONS

    At all times relevant to this Information:

    1.    Defendant LOS ANGELES DOCTORS HOSPITAL, INC. ("LADH") was a California corporation with its principal place of business in Los Angeles, California, within the Central District of California, and was a subsidiary of Pacific Health Corporation ("PHC"), a Georgia Corporation.

    2.    PHC was in the business of operating hospitals, including Los Angeles Metropolitan Medical Center ("LAMMC"),


EXHIBIT B

1  Newport Specialty Hospital, formerly doing business as Tustin
2  Hospital and Medical Center ("THMC"), and Anaheim General
3  Hospital ("AGH")(collectively "the Hospitals"), which it operated
4  through subsidiaries.

5      3.    Defendant LADH administered payroll services for
6  LAMMC staff members who provided health care services to patients
7  admitted to LAMMC for treatment.

8      4.    J.W.Y. was the Chairman and CEO of both PHC and
9  defendant LADH.

10     The Medicare and Medi-Cal Programs

11     5.    Medicare was a federally funded national health care
12  benefit program, affecting commerce, that provided reimbursement
13  for health care services to the elderly and certain disabled
14  persons.

15     6.    Medi-Cal was a health care benefit program, affecting
16  commerce, that provided reimbursement for health care services to
17  indigent persons in California.  Funding for Medi-Cal was shared
18  between the federal government and the State of California.
19  Hospitals in California were generally reimbursed based upon a
20  negotiated contract rate.

21     7.    Individuals who qualified for Medicare or Medi-Cal
22  benefits were commonly referred to as "beneficiaries."

23     8.    Medicare and Medi-Cal reimbursed hospitals,
24  physicians, and other health care providers for medically
25  necessary treatment and services rendered to their respective
26  beneficiaries.

27     9.    To reimburse a provider for inpatient hospital stays,
28  Medicare and Medi-Cal required a prescription or order by a

2

1  physician.

2  B.   OBJECT OF THE CONSPIRACY

3      10.   Beginning in or about July 2003, and continuing to in

4  or about May 2008, in Los Angeles County and Orange County,

5  within the Central District of California, and elsewhere,

6  defendant LADH, PHC, the Hospitals, J.W.Y., Estill Mitts

7  ("Mitts"), and F.M., together with others, knowingly combined,

8  conspired, and agreed to pay kickbacks for patient referrals, in

9  violation of Title 42, United States Code, Section 1320a-

10  7b(b)(2)(A).

11  C.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE

12      ACCOMPLISHED

13      11.   The object of the conspiracy was carried out, and to be

14  carried out, in substance, as follows:

15          a.   Mitts established a facility called the Assessment

16  Center, also known as the 7th Street Christian Day Center,

17  located at 431 East Seventh Street, Los Angeles, California, in

18  the area commonly known as "Skid Row."  Mitts used the Assessment

19  Center as a site for recruiting homeless Medicare and Medi-Cal

20  beneficiaries for referral to LAMMC and the other Hospitals.

21          b.   F.M. established a company that he used to recruit

22  Medicare and Medi-Cal beneficiaries from board and care

23  facilities in Los Angeles and San Bernardino Counties for

24  referral to LAMMC and the other Hospitals.

25          c.   Mitts, F.M., and other co-conspirators working for

26  them referred the Medicare and Medi-Cal beneficiaries (the

27  "recruited beneficiaries") for inpatient admissions to LAMMC and

28  the other Hospitals regardless of the medical necessity of such

3

admissions.

d.   Mitts, F.M., and other co-conspirators working for them arranged to transport the recruited beneficiaries from their locations in Los Angeles County and San Bernardino County to LAMMC and the other Hospitals.

e.   Co-conspirator physicians admitted the recruited beneficiaries to LAMMC and the other Hospitals regardless of the medical necessity of such admissions, and ordered unnecessary tests and services for them.

f.   At J.W.Y.'s direction, PHC provided funds to pay companies owned by Mitts and F.M. for the referral of the recruited beneficiaries admitted to LAMMC and the other Hospitals, and the Hospitals, including LAMMC, issued checks ("kickback payments") for such referrals.

g.   J.W.Y. and PHC approved and the Hospitals, including LAMMC, executed sham "consultant" contracts with Mitts and F.M. to conceal the fact that the Hospitals were making kickback payments to them for the referral of the recruited beneficiaries.

h.   Mitts and F.M. created false "work reports" pursuant to the sham contracts to disguise and justify such illegal kickback payments.

i.   The Hospitals, including LAMMC, billed Medicare and Medi-Cal for hospital stays and related services provided to the recruited beneficiaries, including admissions and services that were medically unnecessary.

j.   Medicare and Medi-Cal paid LAMMC and the other Hospitals for in-patient stays and related services that would

4

1  not have been ordered or provided by the Hospitals but for the

2  kickback payments.

3         k.    At J.W.Y.'s direction, and while J.W.Y. and

4  defendant LADH knew that PHC and the Hospitals had obtained

5  patients through the payment of illegal kickbacks to Mitts and

6  F.M., and that LAMMC and the Hospitals were providing medical

7  care to the recruited patients that could not be submitted as a

8  valid basis to bill Medicare or Medi-Cal, defendant LADH

9  administered the payroll of LAMMC staff who provided billing

10  services for and in-patient services to the recruited patients

11  admitted to LAMMC, including those for whom in-patient

12  hospitalization was not medically necessary.

13  D.    OVERT ACTS

14       12.   In furtherance of the conspiracy and to accomplish its

15  object, defendant LADH, PHC, the Hospitals, J.W.Y., Mitts, and

16  F.M., together with others known and unknown, committed and

17  willfully caused others to commit the following overt acts, among

18  others, within the Central District of California and elsewhere:

19       Overt Act No. 1:   On or about October 3, 2006, PHC approved

20  and THMC issued a check in the amount of $23,375, payable to

21  Metropolitan Healthcare, a company owned by Mitts, as payment for

22  Mitts' referral of recruited Medicare and Medi-Cal beneficiaries

23  admitted to THMC in September 2006.

24       Overt Act No. 2:   On or about October 17, 2006, PHC

25  approved and LAMMC issued a check in the amount of $5,000 payable

26  to Metropolitan Healthcare, a company owned by Mitts, as payment

27  for Mitts' referral of recruited Medicare and Medi-Cal

28  beneficiaries admitted to LAMMC in September 2006.

1    <u>Overt Act No. 3</u>:  On or about October 20, 2006, PHC approved

2  and THMC issued a check in the amount of $29,500, payable to a

3  company owned by F.M., as payment for F.M.'s referral of

4  recruited Medicare and Medi-Cal beneficiaries to THMC in

5  September 2006.

6                                    ANDRÉ BIROTTE JR.
                                     United States Attorney
7

8
                                     ROBERT E. DUGDALE
9                                    Assistant United States Attorney
                                     Chief, Criminal Division
10
                                     BEONG-SOO KIM
11                                   Assistant United States Attorney
                                     Chief, Major Frauds Section
12
                                     CONSUELO S. WOODHEAD
13                                   Assistant United States Attorney
                                     Deputy Chief, Major Frauds Section
14
                                     EVAN J. DAVIS
15                                   Assistant United States Attorney
                                     Major Frauds Section
16

17

18

19

20

21

22

23

24

25

26

27

28